**KENNECOTT CORPORATION and KC Development Inc., Plaintiffs,**

v.

**James SMITH, Chief of the Bureau of Securities in the Division of Consumer Affairs in the Department of Law and Public Safety of the State of New Jersey; John J. Degnan, Attorney General of the State of New Jersey; and Curtiss-Wright Corporation, Defendants.**

**Civ. No. 80–3770.**

United States District Court, D. of New Jersey.

Jan. 30, 1981.

---

Lum, Biunno & Tompkins by William B. McGuire, Newark, N. J., Sullivan & Cromwell by Richard J. Urowsky, D. Stuart Meiklejohn, New York City, for plaintiffs.

Crummy, Del Deo, Dolan & Purcell by John T. Dolan, Newark, N. J., Wachtell, Lipton, Rosen & Katz by Paul Vizcarrondo, Robert Mazur, Eric Roth, New York City, for defendant Curtiss-Wright Corp.

John J. Degnan, Atty. Gen. of N. J., by Ronald S. Blumstein, Deputy Atty. Gen., Newark, N. J., for defendant James Smith.

## OPINION

SAROKIN, District Judge.

### FINDINGS OF FACT

I. THE PARTIES

Kennecott Corporation is a New York corporation with its principal executive offices located at Stamford, Connecticut. Kennecott is an integrated producer of metals (including copper, molybdenum, lead, zinc, iron, titanium, silver and gold), other minerals and various metal and industrial products. KC Development Inc. is a Delaware corporation organized for the purpose of purchasing and holding shares of Curtiss-Wright Corporation stock; it has engaged in no other activity and owns no other assets, other than cash in New York bank accounts. KC Development Inc. is a wholly-owned subsidiary of plaintiff Kennecott Corporation.

James Smith ("Smith") is the Chief of the Bureau of Securities in the Division of Consumer Affairs in the Department of Law and Public Safety of the State of New Jersey ("Bureau of Securities" or "Bureau"). Smith is charged under N.J.Stat.

Ann. § 49:5–11 with administration of the New Jersey Takeover Bid Disclosure Law, N.J.Stat.Ann. §§ 49:5–1 et seq. (the "New Jersey Takeover Law"). He has served in that capacity since 1973. The New Jersey Takeover Law became effective in 1977. Smith has thus been the Bureau Chief during the entire period the statute has been effective. John J. Degnan ("Degnan") is the Attorney General of the State of New Jersey. Pursuant to N.J.Stat.Ann. §§ 52:17B–1 et seq., Degnan is charged with administration and enforcement of the laws of the State of New Jersey.

Curtiss-Wright Corporation ("Curtiss-Wright") is a Delaware corporation with its principal executive offices located at Wood-Ridge, New Jersey. Curtiss-Wright operates principally in five business segments: engineering, production, sale and service of process equipment for treatment of suspended solids; research into and the production, sale and service of electrical generating equipment; production and sale of other industrial products; design, manufacture and sale of products for use in nuclear facilities; and production and sale of various products used in the aerospace industry. Curtiss-Wright's common stock is registered under Section 12 of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78l, and is listed for trading on the New York Stock Exchange.

Curtiss-Wright and its wholly owned subsidiaries have substantial assets within the state, including facilities in Wood-Ridge, Fairfield, Paramus and Carlstadt, New Jersey. Approximately 1600 people are currently employed in the State of New Jersey by Curtiss-Wright or its wholly-owned subsidiaries. An additional 400 people are currently employed in the state by partially-owned subsidiaries of Curtiss-Wright. Curtiss-Wright and its wholly and partially-owned subsidiaries employ in excess of 4800 people outside the State of New Jersey. (Exhs. DCW–6 & 7) It maintains substantial pension, retirement, health and welfare benefit programs for its employees. Since its employees are, on the average, fairly advanced in age and length of service to the company, they are particularly vulnerable to the termination of their employment or their employment benefits. (Exhs. DCW–10, 11, 12 & 13) Federal law would not guarantee the continuation of the health and welfare benefits (e. g., life insurance, hospital insurance, medical insurance) of its employees in the event that Kennecott acquired and terminated those benefit programs. The Curtiss-Wright Pension Program is an employer-funded pension program maintained for the benefit of the company's union employees. That program currently has an unfunded actuarial liability of approximately $41 million. In the event that Kennecott acquired control of Curtiss-Wright and terminated the Pension Program, the Pension Benefit Guarantee Corporation ("PBGC") would guarantee the pensions of all employees whose rights thereto have vested. The PBGC could then levy upon Curtiss-Wright's assets, up to 30 per cent thereof, to satisfy the amount of any unfunded actuarial liability. (Exh. DCW–9)

## II. EVENTS GIVING RISE TO THIS ACTION

On November 21, 1980, Kennecott issued a press release announcing its intention to commence a cash tender offer for up to 4.1 million shares of common stock of Curtiss-Wright at a price of $40 net per share. Kennecott's Board of Directors had authorized the offer by a unanimous vote of 14 directors (with four directors abstaining) on the same day.[1] (Exh. P–7)

Kennecott's offer was extended to all of Curtiss-Wright's shareholders, who then numbered approximately 35,706 and who are found throughout the United States. The aggregate value of Kennecott's offer exceeded $160 million. As of December 8, 1980, Curtiss-Wright had 2,239 record

---

1. Curtiss-Wright disputes that Kennecott's Board of Directors legally authorized Kennecott's tender offer for Curtiss-Wright stock. The issue is currently the subject of litigation in federal court in New York, where Curtiss-Wright's expedited appeal from the denial of its preliminary injunction motion is now pending before the Second Circuit.

shareholders who resided within the State of New Jersey.

## III. COURSE OF PROCEEDINGS

Kennecott filed this action on November 21, 1980, naming Smith, Degnan and Curtiss-Wright as defendants, and seeking (1) a declaratory judgment that the New Jersey Takeover Law was unconstitutional as applied to Kennecott's tender offer for shares of Curtiss-Wright and (2) preliminary and permanent injunctive relief restraining enforcement of the New Jersey Takeover Law against the Kennecott offer. At the time it filed its complaint, Kennecott secured a temporary restraining order prohibiting Curtiss-Wright from attempting to enforce the New Jersey Takeover Law. At the same time, Smith agreed not to take any steps to enforce the statute until a decision on Kennecott's motion for a preliminary injunction.

On November 25, 1980, this court denied Kennecott's motion for a preliminary injunction and vacated its existing temporary restraining order, concluding that Kennecott had failed to meet its burden of showing a probability of success on the merits or irreparable harm if the injunction were not granted. Following this court's order of November 25, 1980, the defendants took steps to enforce the New Jersey Takeover Law. Smith, in his capacity as the Chief of the New Jersey Bureau of Securities, issued a cease and desist order on November 26, 1980 that directed Kennecott not to commence the tender offer before the expiration of the 20-day waiting period prescribed by N.J.Stat.Ann. § 49:5–3 or otherwise to violate the New Jersey Act. On the same day Kennecott filed a notice of appeal from that order with the Appellate Division of the Superior Court of New Jersey.

On November 28, 1980, Kennecott published a summary advertisement containing the essential terms of the offer in the national financial press. On the same day Kennecott also filed a disclosure statement on Schedule 14D–1 with the Securities and Exchange Commission ("SEC"). (Exh. P–7) On December 1, 1980, Smith applied to the Appellate Division for an order vacating the stay effected by Kennecott's appeal from its November 26 order, and enjoining Kennecott from engaging in any acts in furtherance of the tender offer, including any solicitation of offerees in favor of the offer. The presiding judge of the Appellate Division granted the motion for temporary relief. Following a hearing on December 9, 1980, a panel of the Appellate Division continued the restraints against Kennecott by enforcing the cease and desist order.

On December 1, 1980, Curtiss-Wright formally requested that defendant Smith hold a hearing on Kennecott's offer pursuant to N.J.Stat.Ann. § 49:5–4. On December 11, 1980, the day that the 20-day waiting period prescribed by N.J.Stat.Ann. § 49:5–3 expired, Smith announced that he would hold a hearing to determine whether (1) Kennecott's alleged plans for material changes in Curtiss-Wright's corporate structure would be in the best interests of Curtiss-Wright's remaining shareholders and employees, (2) the terms of a proposed second step merger between Kennecott and Curtiss-Wright were fair and (3) Kennecott's tender offer would adversely affect the pension rights of Curtiss-Wright employees. Smith prohibited Kennecott from going forward with its tender offer during the pendency of the hearing, but advised Kennecott that he would narrow the scope of the hearing to include only issue (1) if Kennecott undertook to engage an independent investment banking firm to pass upon the fairness of the proposed merger and provided Smith with certain assurances regarding the pension rights of Curtiss-Wright employees.

Although the New Jersey Act provides for 20 days' notice of the hearing to the target company and the offeror, both Curtiss-Wright and Kennecott waived such notice and agreed to commence the hearing seven days after the issuance of the Bureau Chief's order directing a hearing to be held; and although the New Jersey Act requires the Bureau Chief to render his decision following a hearing within 60 days, in his order directing the convening of a hearing with respect to Kennecott's tender offer for

Curtiss-Wright stock, the Bureau Chief stated that he would render a decision within five days of the conclusion of said hearing. The Bureau Chief was not required by any regulation promulgated under the New Jersey Act to render his decision prior to the conclusion of the 60-day period prescribed by the statute.

On December 1, 1980, Curtiss-Wright also commenced an action in the New Jersey Superior Court, Chancery Division, seeking injunctive relief against Kennecott's tender offer and the voting of any shares that Kennecott acquired thereby. Curtiss-Wright's complaint relied on the sections of the New Jersey Takeover Law that delay commencement of tender offers. On November 26, 1980, Kennecott appealed this court's order denying preliminary relief to the United States Court of Appeals for the Third Circuit. On December 17, 1980, a panel of that Court reversed and remanded.

On December 19, 1980, this court enjoined defendants "from taking any steps to enforce any provisions of the New Jersey Takeover Bid Disclosure Law against [Kennecott's] ... tender offer ... that would interfere with the continuation of such tender offer as prescribed by the Williams Act and the regulations promulgated thereunder...." This court further enjoined defendants from opposing an application by Kennecott to the Appellate Division of the New Jersey Superior Court for dissolution of that Court's orders of December 1 and 9 to the extent that said orders were inconsistent with the federal injunction. On December 19, 1980, the Appellate Division of the New Jersey Superior Court vacated its orders entered on December 1 and 9 and stayed the Bureau Chief's cease and desist order of November 26, 1980 to the extent such order was inconsistent with the federal injunction and the Appellate Division's December 19, 1980 order.

On December 22, 1980, the defendants appealed from this court's injunction on the ground that it was broader than contemplated by the Court of Appeal's decision, and prohibited the Bureau Chief from conducting a hearing, pursuant to the New Jersey Takeover Law, prior to the consummation of Kennecott's tender offer. Defendants also sought a stay of the injunction pending appeal. On December 23, 1980, the Court of Appeals denied defendants' motion for a stay but granted their motion for an expedited appeal, scheduling argument for the week of February 23, 1981. On December 24, 1980, Curtiss-Wright again sought a stay of the district court's injunction from the Court of Appeals pending appeal to the Supreme Court, which was denied. On December 25, 1980, Curtiss-Wright filed a petition for a stay pending appeal in the Supreme Court. On December 26, 1980, Justice Brennan denied the stay.

On December 29, 1980, Kennecott purchased approximately 2,000,000 shares of Curtiss-Wright common stock. On December 30, 1980, Kennecott extended its offer at the same price until January 9, 1981. Kennecott has purchased for $40 per share all of the shares tendered by Curtiss-Wright shareholders prior to the original December 26, 1980 termination date of its tender offer. Curtiss-Wright announced a tender offer for 1,000,000 of its own shares, and on January 2, 1981 it announced that it would pay $46 per share.

## IV. PREEMPTION FINDINGS

Prior to this case, the New Jersey Bureau of Securities had asserted jurisdiction over five tender offers. No public hearing has ever been held pursuant to the New Jersey Act. Prior to Kennecott's tender offer for Curtiss-Wright, the sole tender offer subject to the New Jersey Act in which a hearing was requested and ordered was United Technologies Corporation's tender offer for The Babcock & Wilcox Company. The Bureau Chief cancelled the hearing and gave United Technologies Corporation permission to proceed with its offer upon its representation that it would comply with the Bureau Chief's interpretation of withdrawal rights set forth in Section 9 of the New Jersey Act.

The Bureau Chief has never attempted to apply the New Jersey Act to a tender offer

in which *only* shareholders and employees located outside New Jersey were affected by the offer. The Bureau Chief has taken the position that for the purposes of the New Jersey Act a corporation has only one principal place of business, and that a tender offer for the stock of a target corporation with its principal place of business in another state is not subject to the New Jersey Act.

In an attempt to harmonize New Jersey law with the requirements of SEC Rule 14d–2, in April 1980 the Bureau of Securities amended its regulations to provide that an offeror need not make public those facts that "trigger" the commencement of its offer under SEC Rule 14d–2(b). The language of the amended New Jersey rule, N.J.A.C. 13:47A–26.2—which permits an offeror to withhold public disclosure of the amount of shares sought and the consideration to be offered therefor—repeats verbatim the language of the SEC's "safe harbor" provision, SEC Rule 14d–2(d). Said regulations define the "material terms" of an offer (for purposes of N.J.Stat.Ann. 49:5–3) to include, but not be limited to, the following: the identity of the offeror, the identity of the target and a statement that the offeror intends to make an offer for an unspecified amount and class of securities of the target (N.J.A.C. 13:47A–26.2). The New Jersey Takeover Law requires disclosure of the price offered and amount of shares sought *to the target company*, which under the rules of the New York Stock Exchange must disclose that information. Once the terms of the offer were disclosed to the market, a situation would exist which is inconsistent with continued use of the "safe harbor" provisions of Rule 14d–2(b).

In this case, and in every prior assertion of jurisdiction over a tender offer, the Bureau of Securities has taken the position that the offer could not go forward until expiration of the 20-day waiting period prescribed by N.J.Stat.Ann. § 49:5–3. The Bureau Chief has taken the position that, assuming that the pre-commencement portions of the New Jersey Act are invalid, those portions of the Act may be severed and the remainder of the Act can still be given reasonable effect. The severance proposed by the Bureau Chief—the deletion of certain portions of Sections 3a and 8a of the New Jersey Act—would permit the Bureau Chief to, *inter alia*, hold a public hearing following the commencement of an offer and prior to its consummation. The Bureau also has taken the position that the offer could not commence until the Bureau Chief granted his permission pursuant to N.J.Stat.Ann. § 49:5–4; and that if a hearing were called under N.J.Stat.Ann. § 49:5–4, the offer could not commence until the hearing was concluded and the Bureau Chief permitted the offer to proceed.

In this case, the Bureau took the position that the Bureau Chief could not waive the statutory requirement, contained in N.J. Stat.Ann. § 49:5–4, that Kennecott's offer could not proceed until a hearing was concluded and the Bureau Chief permitted the offer to proceed.

■ On December 19, 1980, at a hearing before the Appellate Division of the Superior Court, the Bureau sought to maintain in place so much of the Appellate Division's orders of December 1 and 9 as would restrain Kennecott from consummating its offer, and purchasing any Curtiss-Wright shares, pending a conclusion of a hearing held pursuant to N.J.Stat.Ann. § 49:5–4. The Appellate Division denied the request. Neither the legislative history nor the past administration of the New Jersey Takeover Law supports a construction of the statute that would permit a hearing under N.J. Stat.Ann. § 49:5–4 after a tender offer has commenced.

N.J.Stat.Ann. § 49:5–8(a), as interpreted by the Bureau Chief, prohibits solicitation in a takeover bid prior to the time that the offeror is granted permission to proceed by the Bureau. (Such pre-permission solicitation is deemed by the statute to be a "fraudulent" act.) It imposes no limitation on the length of a hearing called pursuant to N.J.Stat.Ann. § 49:5–4. Nor has the Bureau adopted any regulations imposing such a limitation. The Bureau Chief testified, however, that the number of witnesses

that a target company sought to produce at the hearing would be limited by the Bureau Chief in the exercise of his discretion; that intervention would be limited to persons capable of showing a sufficient interest in and relationship to the proceeding and having relevant questions to be posed; and that duplicative questioning would not be permitted.

N.J.Stat.Ann. § 49:5–4(b), as interpreted by the Bureau Chief, requires that the offeror and the target company be given at least 20 days' notice of the convening of a hearing. The statute permits the Bureau Chief to give longer notice. Although subject to the aforesaid discretion of the Bureau Chief, the statute permits a target company to participate in and present witnesses at a hearing called pursuant to that section, and imposes no limitation on the number of witnesses that a target company may present at a hearing convened pursuant to N.J.Stat.Ann. § 49:5–4. Nor has the Bureau adopted any regulations imposing such a limitation. In its Basis Statement supporting a request for a hearing, Curtiss-Wright proposed to call 22 witnesses at a hearing on Kennecott's offer. (Exh. DCW–1) The statute enables target companies to cross-examine witnesses at a hearing convened pursuant to that section; and it imposes no limitation on the length of time that a target company can cross-examine witnesses at a hearing convened.

The Bureau Chief must permit interested members of the public to intervene in a hearing called pursuant to that section, which may include stockholders of the target company, its employees, the employees' union, civic groups in communities where the target company has industrial facilities, suppliers of the target company and the target company's customers, according to the Bureau Chief's interpretation of the statute.

It permits an intervenor to present and cross-examine witnesses at a hearing convened pursuant to that section. The statute imposes no limitation on the number of witnesses an intervenor may call. Nor has the Bureau adopted any regulations imposing such a limitation.

The statute, as interpreted by the Bureau Chief, permits the Bureau to inquire into the following matters at a hearing convened to consider whether a tender offer will be permitted:

(i) the financial condition of the offeror, the effect of the acquisition on the financial stability of the target company and the effect of the takeover on security holders or employees not affiliated with the offeror by reason of financial instability of the offeror or the target;

(ii) the fairness of the terms of the offer, which terms may include price, withdrawal rights, *pro rata* rights, the character of the consideration and the fairness of any subsequent merger between the target company and the offeror;

(iii) plans of the offeror, if any, to alter the target company's business or corporate structure, which plans may include closure of the target's New Jersey operations; and

(iv) the economic integrity and competence of the individuals who would control the target company if the offer were successful.

If, after a hearing called under N.J.Stat. Ann. § 49:5–4, the Bureau Chief determined that an offeror's financial condition is such that it might jeopardize the financial stability of the target or prejudice the interest of the target's security holders or employees, the Bureau Chief would prohibit the offer from going forward, unless there were a way to remedy the offeror's financial condition. However, in this matter, the financial condition of Kennecott was not presented by Curtiss-Wright as a grounds for convening a public hearing herein, and the Bureau Chief did not base his determination to hold a hearing on such ground. (Exh. DCW–5) If, after a hearing, the Bureau Chief determined that a tender offer's terms were unfair or inequitable, the Bureau Chief would prohibit the offer from going forward, unless such terms were satisfactorily changed.

N.J.Stat.Ann. § 49:5–9, as interpreted by the Bureau Chief, provides for withdrawal rights that run to a later time than the withdrawal rights provided by federal law. There is no maximum withdrawal period required by federal law.

If the Bureau Chief determined that a tender offeror intended to alter a target company's business in a way that would prejudice its remaining shareholders or employees, the Bureau Chief would prohibit the offer from going forward. For this purpose, the Bureau Chief would deem the target company's employees to be adversely affected if the offeror intended to close down healthy business operations of the target in New Jersey, discharge employees working in such operations and move such operations out of state. Whether or not such a decision would actually be made would depend upon the exact facts and circumstances developed at an evidentiary hearing conducted pursuant to the New Jersey Act.

If the Bureau Chief determined that the competence or integrity of a tender offeror's management were such that they would prejudice the target company's remaining shareholders or employees, the Bureau Chief would prohibit the offer from going forward. If he determined that a tender offer was in violation of any of the standards set forth in N.J.Stat.Ann. § 49:5–4, he would prohibit the offer even though full and fair disclosure had been made to offerees and the offer was otherwise in compliance with all applicable federal law. In such an event, the New Jersey Takeover Law, as interpreted by the Bureau Chief, would render it unlawful to proceed with the offer in any part of the United States.

 Allegations of inadequate disclosure, standing alone, are not sufficient grounds for convening a hearing under N.J. Stat.Ann. § 49:5–4. The sole purpose of a hearing under N.J.Stat.Ann. § 49:5–4 is to determine whether the substantive standards of that section have been met. Disclosure statements filed pursuant to N.J. Stat.Ann. § 49:5–3 are kept confidential by the Bureau Chief, and are used for the sole purposes of determining whether to convene a hearing pursuant to N.J.Stat.Ann. § 49:5–4 and whether there are any egregious disclosure problems relating to the offer.

The Act does not require the Bureau Chief to reach a decision regarding the permissibility of a tender offer until 60 days after the conclusion of a hearing called pursuant to that section. If, after the Bureau Chief permits a tender offer to go forward, the Bureau Chief's order is stayed pursuant to N.J.Stat.Ann. § 49:5–17, the offer may not go forward. In the case of the takeover of The Babcock and Wilcox Company in 1977, United Technologies Corporation's tender offer was restrained for more than two months on the basis of this provision of the New Jersey Takeover Law alone. However, any appeal from the Bureau Chief's decision would probably be expedited.

N.J.Stat.Ann. § 49:5–8(a) has never been enforced against a target company's solicitations urging rejection of a tender offer, although the Bureau Chief has never been specifically requested to enforce Section 8a of the New Jersey Act against a target company. The Bureau enforced N.J.Stat. Ann. § 49:5–8(a) against Kennecott in this case, but did not enforce it against Curtiss-Wright's December 2 letter to its stockholders urging rejection of Kennecott's offer. (Exh. P–1) Neither Kennecott nor its attorneys ever requested that the Bureau Chief enforce Section 8a against Curtiss-Wright.

In a contested tender offer, a five day pre-commencement delay imposed by a state law could significantly affect or alter the balance between an offering company and a target company because time is an important factor for each. Once the offer has begun, a delay of even a few days in consummating the offer could significantly affect its outcome. The ability to consummate the offer in a short period is highly advantageous to the offeror and is a detriment to the target company. The ability to consummate a tender offer is the key to the offer's success. Delays in consummation of

tender offers affect the success of such offers in the same manner as delays in commencement.

## V. INTERSTATE COMMERCE FINDINGS

One reason why the Bureau Chief ordered a hearing under N.J.Stat.Ann. § 49:5–4 was to determine whether Kennecott planned to close down any of Curtiss-Wright's New Jersey operations, which would mandate that a hearing be called if a tender offeror planned to close down any of the target's New Jersey plants.

If a tender offeror were denied permission to proceed under the New Jersey Takeover Law, then the New Jersey Takeover Law, as interpreted by the Bureau Chief, would render it unlawful to proceed with the offer in any part of the United States.

As interpreted by the Bureau Chief, the Act is designed in part to protect employees and shareholders who reside outside the State of New Jersey. If, after a hearing pursuant to N.J.Stat.Ann. § 49:5–4, the Bureau Chief determined that a tender offer adversely affected *only* shareholders or employees of the target company *outside* the State of New Jersey, the Bureau Chief would prohibit the offer from going forward.

## INTRODUCTION

Although this case involves the complex and sophisticated world of corporate takeovers, it contains some simple truths. Delay in takeover offers inures to the benefit of the target company and is detrimental to the offeror company. Whether or not the investor is injured or benefitted by such delays is disputed by the combatants. However, that issue has been decided by Congress, which has decreed that delays are disadvantageous to the investor. The principals profess to advance the interests of the shareholders in their respective arguments; however, any benefits to the investor predicated upon the positions advanced by either party is purely coincidental. The parties to this action (excluding the state) seek to further, protect or acquire, as the

case may, a substantial economic interest. If the investor is a victor in this arena, it is despite, rather than because of, the acts and intentions of the offeror and the target.

Tender offers are subject to federal regulation under the Williams Act. A majority of the states, as well, have enacted statutes which regulate tender offers. If both are enforceable, an offeror must satisfy both statutory schemes. Whether or not such state statutes are preempted by the federal act depends upon a determination of whether they merely supplement or are inconsistent with the purposes of the federal enactment. However, a determination that the state act supplements the federal act does not necessarily require a conclusion that such act does not frustrate the federal act. Added requirements and standards may impede the federal legislation.

The prime purpose of the Williams Act was to assist investors confronted with a cash tender offer in making an informed decision as to whether they should or should not tender their shares. It is intended to provide shareholders with the information necessary to evaluate the merits of a proposal.

The prime criticism directed at state takeover statutes is that they impose different or added burdens on the offeror to protect local companies and their management from takeovers. Furthermore, the additional disclosure requirements of such statutes represent a burden in themselves. Delays are promoted, and such delays redound to the benefit of the target company's management. Substantive and procedural weapons are provided to delay and discourage such bids. A corollary to investor protection is the concept of evenhanded regulation. It is argued that such statutes conflict with the balance envisioned by the Williams Act.

This court recognizes that it should be highly solicitous of state interests when considering the issue of preemption. There has been no specific expression by Congress excluding the states from this area of regulation, nor does it appear that

such intent can be inferred. Therefore, the sole issue before this court in respect to preemption is whether the state regulation "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress". *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

The subject statute is also challenged on the grounds that it is violative of the commerce clause of the Constitution. It is argued that such statutes interfere with interstate commerce by imposing burdensome filing requirements on offerors, by regulating transactions involving shareholders who live in other states, and by prohibiting or impeding the issuance of nationwide tender offers. It is necessary to determine whether the burdens imposed on interstate commerce by local tender offer statutes are balanced by any legitimate state interest. Such analysis must be applied to the separate provisions of the state statutes.

 All such statutes have an extraterritorial effect. Nonresident offerors and nonresident investors come within their ambit. This court must determine whether, despite such effects, the statute in issue effectuates a legitimate state interest.

Having set forth the issues and the general guidelines to be applied thereto, the court submits the following analysis of the specific statute here in issue.

## CONCLUSIONS OF LAW

I. *THE NEW JERSEY TAKEOVER LAW IS PREEMPTED BY THE WILLIAMS ACT.*

The Williams Act and the regulations promulgated thereunder were enacted to establish a comprehensive regulatory framework governing tender offers. Investors are to be provided all material information with respect to an offer and be given the unfettered right to accept or reject such offer. In enacting the Williams Act, Congress adopted the "market approach" to tender offers, under which public investors determine the acceptability of such offers. Secondarily, Congress recognized that tender offers often create competitive situations, and, therefore, it sought to establish and maintain a careful balance between the offeror and management of the target company. The purpose of the legislation is to protect public investors (i) by insuring that they receive adequate information promptly and (ii) by not imposing such burdens on tender offers that they will become unavailable.

 The New Jersey Takeover Law is not consistent with that purpose and intercedes in the free choice of investors. It creates a system which imposes obstacles to the commencement and completion of a tender offer and in which the outcome of the offer may be determined by a single individual, the Bureau Chief, rather than the informed judgment of public investors. The procedures imposed by the New Jersey Takeover Law are accordingly incompatible with the intent and purpose of the Williams Act.

A. *The Regulation of the Tender Offers Under the Williams Act.*

The underlying purpose of the Williams Act is the protection of investors. *Piper v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 30, 97 S.Ct. 926, 943, 51 L.Ed.2d 124 (1977). In enacting the Williams Act, Congress determined to protect the investing public through a "market approach" in which there is a "free flow of information from both sides, so that knowledgeable shareholders can make an unfettered and knowledgeable choice whether to relinquish their shares for a cash premium." *Kennecott Corp. v. Smith*, 637 F.2d 181 at 188 (3d Cir. 1980). Under the market approach, the "function of federal regulation is to get information to the investor by allowing both the offerer and the incumbent managers of a target company to present fully their arguments and then to let the investor decide for himself." *Great Western United Corp. v. Kidwell*, 577 F.2d 1256, 1276 (5th Cir. 1978), *rev'd on venue grounds sub nom. Leroy v. Great Western United Corp.*, 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). *Accord, MITE Corp. v. Dixon*, 633

F.2d 486, [Current] Fed.Sec.L.Rep. (CCH) ¶ 97,660, at 98,498 (7th Cir. 1980).

In furtherance of the policy to permit investors to determine their own economic self-interest, the Williams Act was carefully designed not to defeat or discourage tender offers, but to provide a balanced framework between the interests of the acquiring company and incumbent management of the target company. As the Supreme Court noted in commenting on the Williams Act in *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975):

"The Congress expressly disclaimed an intention to provide a weapon for management to discourage takeover bids. . . . Indeed, the Act's draftsmen commented upon the 'extreme care' which was taken 'to avoid tipping the balance of regulation either in favor of management or in favor of the person making the takeover bid.' "

*MITE*, 633 F.2d 486, [Current] Fed.Sec.L. Rep. (CCH) at 98,501 (footnote omitted).

■ Both the Congress and the courts have recognized that the most potent weapon available to incumbent management is delay. *Kennecott Corp.*, 188–189; *MITE*, 633 F.2d 486, [Current] Fed.Sec.L.Rep. (CCH) at 98,502–03; *Kidwell*, 577 F.2d at 1277–78. As the Court of Appeals for this Circuit has determined, delay frustrates the purpose of the Williams Act in three critical ways: (i) delay of the commencement of a tender offer denies investors the critical information about both the offer and the offeror that is essential to making the kind of informed choice contemplated by the "market approach"; (ii) delay is inevitably used by the incumbent management of the target, through various defensive tactics, to deprive shareholders of the opportunity to choose at all, *see, e. g., Kennecott Corp.*, at 188–189; and (iii) delay harms an offeror whose offer may be frustrated "not through adverse action of the shareholders, as Congress contemplates, but through barriers erected by the target management." *Id.* at 189.

■ Curtiss-Wright offered evidence in this matter to contravene Kennecott's contention that delay was necessarily detrimental to shareholders. However, in *Kennecott Corp.*, the Court of Appeals for this Circuit held that it is neither necessary nor appropriate to attempt to adjudicate policy issues already resolved by Congress.

"A traditional testimonial record is not necessary here since Congress has already established the record—after extensive hearings Congress determined that delay is detrimental to the interests of the investing public. We are not free to challenge this legislative judgment."

*Id.* at 190. *See MITE*, 633 F.2d 486, [Current] Fed.Sec.L.Rep. (CCH) at 98,503. This court cannot reach a different conclusion in connection with an application for a permanent injunction, where the appellate court has so ruled in connection with an application for a preliminary injunction.

B. *The New Jersey Takeover Law Frustrates The Purpose of the Williams Act.*

■ The New Jersey Takeover Law provides for a system of regulation of tender offers that directly frustrates the purpose of the Williams Act. Under the New Jersey statute (which can be invoked unilaterally by target management, *see* N.J. Stat.Ann. § 49:5–4(b)) the neutral market approach provided for in the Williams Act is disrupted by an array of provisions, discussed in detail below, that combine (i) to delay and obstruct tender offers, (ii) to substitute the Bureau Chief's view of the offer for the informed judgment of shareholders, (iii) to burden offerors with unnecessary and improper disclosure requirements, and (iv) to delay completion of an offer through proration and withdrawal provisions which conflict with the federal act. The effect of these provisions, individually and *in toto*, is to aid the incumbent management of the target and to prevent or impede investors from exercising their right to accept a favorable tender offer. This court concludes that portions of the New Jersey Takeover Law are invalid because "any state legislation which frustrates the full effectiveness of federal law is rendered invalid by the

Supremacy Clause." *Perez v. Campbell,* 402 U.S. 637, 652, 91 S.Ct. 1704, 1712, 29 L.Ed.2d 233 (1971). *Accord, Hisquierdo v. Hisquierdo,* 439 U.S. 572, 99 S.Ct. 802, 59 L.Ed.2d 1 (1979); *Ray v. Atlantic Richfield Co.,* 435 U.S. 151, 98 S.Ct. 988, 55 L.Ed.2d 179 (1978); *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964).

1. *Pre-Commencement Waiting Period and Permission to Proceed.*

The New Jersey Takeover Law provides that no offer may go forward unless the Bureau Chief permits it to proceed after the expiration of a 20 day pre-commencement waiting period. N.J.Stat.Ann. § 49:5–3(a). Such pre-commencement waiting requirements frustrate the purpose and effect of the Williams Act, because they "prevent prompt disclosure of crucial information to the shareholders, and, through delay, . . . shift the advantage in [the] struggle to incumbent management." *Kennecott Corp.,* at 187. Congress considered and specifically rejected a requirement that an acquiring company make public disclosure of a proposed tender offer prior to the offer's commencement. Such pre-commencement notice was thought to be unnecessary and "might delay the offer when time is of the essence." S.Rep.No. 550, 90th Cong., 1st Sess. 4 (1967). Such reasoning was the basis for the decision of the Court of Appeals for the Seventh Circuit in *MITE* which held that the 20 day pre-commencement waiting period required by the Illinois takeover law was preempted by the Williams Act. *MITE,* 633 F.2d 486, [Current] Fed.Sec.L.Rep. (CCH) at 98,500–02.

2. *The Hearing Provisions.*

After the 20 day pre-commencement waiting period has expired, the Bureau Chief may decline to allow an offer to go forward, if he determines that a hearing is necessary. N.J.Stat.Ann. § 49:5–4(a). The New Jersey statute explicitly prohibits an offeror from making an offer prior to the issuance of an order to proceed by the Bureau Chief, N.J.Stat.Ann. § 49:5–8, and re-

quires that the Bureau Chief either decide not to hold a hearing or, if he determines that one is necessary, conduct a hearing prior to issuance of an order to proceed. N.J.Stat.Ann. § 49:5–4.

The statute provides that the issues to be determined at the hearing include whether:

"(1) The financial condition of the offeror is such as to jeopardize the financial stability of the target company, or prejudice the interests of any employees, or securityholders who are unaffiliated with the offeror;

(2) The terms of the takeover bid are unfair or inequitable to the securityholders of the target company;

(3) The plans and proposals which the offeror has to make any material change in the target company's business or corporate structure or management, are not in the interest of the target company's remaining securityholders, or employees;

(4) The competence, experience and integrity of those persons who would control the operation of the target company are such that it would not be in the interest of the target company's remaining securityholders, or employees to permit the takeover; or

(5) The terms of the takeover bid do not comply with the provisions of this act."

The New Jersey Statute also provides no time limit within which such hearing must conclude and provides that the target company, among others, may embark on a program of discovery prior to the hearing. N.J.Stat.Ann. § 49:5–4(b). After the hearing, if the Bureau Chief decides that one of the above-mentioned conditions pertains, he may prohibit the offer from going forward. N.J.Stat.Ann. § 49:5–4(a). In such instance, the shareholders will not be afforded the right of decision contemplated by the federal legislation.

On December 11, 1980 defendant Smith ordered that a hearing be held in connection with Kennecott's offer. The hearing was to explore the questions whether:

a) "... Kennecott's proposed second-step merger with Curtiss-Wright, in the event takeover bid is completed, [will] be fair to Curtiss-Wright's remaining securityholders;

b) ... Kennecott [has] any plans or proposals to make any material change in Curtiss-Wright's business not in the interests of Curtiss-Wright's remaining securityholders or employees; and

c) ... Kennecott [has] any plans or proposals to alter or eliminate the pension or benefit plans presently enjoyed by employees of Curtiss-Wright...."

*In the Matter of: The Takeover Bid by KC Development Inc., a wholly owned subsidiary of Kennecott Corporation For Equity Securities of Curtiss-Wright Corporation,* No. TO–5–80 (N.J.Bur.Sec. December 11, 1980) at 31.

██ Such a hearing is diametrically opposed to the market approach to tender offers embodied in the Williams Act. The Williams Act requires full disclosure precisely because investors are expected to make their own decision to accept or reject a tender offer. The New Jersey Takeover Law confers upon the Bureau Chief the power to prohibit consideration by shareholders of the ultimate question which the Williams Act intended be submitted to them.

The Bureau Chief may not wield such power. Courts have struck down similar hearing provisions in other state takeover statutes. In so doing in *MITE*, the Court of Appeals for the Seventh Circuit held that:

"Illinois' substitution of the judgment of its Secretary of State for an investor's own assessment of the equitability of an offer is patently inconsistent with the Williams Act, but not primarily because the state statutory process may unduly slow the progress of tender offers. Rather, this approach to investor protection by "benevolent bureaucracy" is preempted by the conflicting approach of the Williams Act, which contemplates unfettered choice by well-informed investors."

633 F.2d 486, [Current] Fed.Sec.L.Rep. (CCH) at 98,499.

In *Hi-Shear Industries, Inc. v. Campbell,* No. 80–2211–9 (D.S.C. Dec. 4, 1980), *stay pending appeal denied,* Nos. 80–1825, 80–1826 (4th Cir. Dec. 8, 1980), the District Court for the District of South Carolina likewise struck down the hearing provisions of the South Carolina Tender Offer Disclosure Act:

"The benevolent bureaucracy approach is in conflict with the market approach and frustrates the express congressional intent that the *shareholders* make *their* decision. Thus, to the extent that the South Carolina Securities Commissioner insists upon having a hearing to determine the fairness of the offer, its regulatory approach frustrates federal law and is unconstitutional."

Slip op. at 9 (emphasis in original). *See Kidwell,* 577 F.2d 1256, 1276–78 (1976).

The Court of Appeals for this Circuit has explicitly held that the Williams Act adopted the "market approach for protecting investors." *Kennecott Corp.,* at 189. Accordingly, the hearing provisions of the New Jersey Takeover Law frustrate the market approach and, therefore, they must yield to federal law.

3. *Administrative and Judicial Restraints.*

The New Jersey Takeover Law provides that the Bureau Chief may stop any offer by issuing a cease and desist order against any violation of the statute. N.J.Stat.Ann. § 49:5–12(a). The Bureau Chief may also seek a judicial restraining order against an offer in the New Jersey Superior Court. *Id.* By virtue of said provisions, no offer may be put to the shareholders unless and until the Bureau Chief so decides. In this case, the Bureau Chief issued a cease and desist order on November 26, 1980, and obtained from the Superior Court, Appellate Division, a restraining order preventing the continuation of Kennecott's offer on December 1, 1980. Kennecott was under said restraint until December 19, when the Appellate Division dissolved its restraining order in accordance with the preliminary

injunction issued by this court. During this period of delay, Curtiss-Wright was able to take various defensive measures, such as sending a letter to its shareholders stating that the offer was "unfair" and not in their interests. *Kennecott Corp.*, at 188–189.

■ The New Jersey Takeover Law provides in section 49:5–12(b) for a private right of action under the statute and specifically provides that a court may issue preliminary or permanent injunctive relief on motion of the target company to enforce the statute. N.J.Stat.Ann. § 45:5–12(b). These provisions, put in the hands of management of a target company, provide the means to delay or prevent the offer. Because such provisions undermine the neutrality inherent in the market approach, they must be invalidated in order to effectuate the purpose of the Williams Act. *See, MITE*, 633 F.2d 486, [Current] Fed.Sec.L. Rep. (CCH) at 98,500; *Kidwell*, 577 F.2d at 1278.

### 4. *The Automatic Stay Provision.*

Section 49:5–17 of the New Jersey Takeover Law provides that the filing of an appeal from any determination, order or any other action by the Bureau Chief "shall stay the application of any such . . . order or other action of the bureau chief to the appealing party." N.J.Stat.Ann. §§ 49:5–17(a), 49:5–17(b).

■ Under that provision of the statute, a target company could unilaterally delay a tender offer, even if the Bureau Chief were to approve it and no other judicial restraint were in effect. Such a potent weapon in the hands of the management of the target company contradicts the neutral market approach embodied in the Williams Act. In *MITE*, the Court of Appeals for the Seventh Circuit invalidated a similar provision of the Illinois takeover statute which permitted management to delay an offer by requiring the Illinois Secretary of State to hold a hearing. *MITE*, 633 F.2d 486, [Current] Fed.Sec.L.Rep. (CCH) at 98,500. The automatic stay provision of the New Jersey statute, which enables a target company to stop the offer unilaterally, frustrates the neutral policy of the Williams Act and is therefore invalid.

### 5. *Disclosure Requirements.*

■ The New Jersey Takeover Law requires offerors to disclose certain information in a Disclosure Statement filed with the Bureau of Securities. N.J.Stat.Ann. § 49:5–3. Although several of the required disclosures overlap disclosure required by the Williams Act, *cf.* Schedule 14D–1, 17 C.F.R. 240.14d–100, the overall purpose and effect of the requirements of the New Jersey statute are different. For example, the New Jersey Statute requires that an offeror disclose the "method by which the fairness of the proposal to the offerees was arrived at." N.J.Stat.Ann. § 49:5–3(b)(9). Such a disclosure requirement is intended for the use of the Bureau Chief in determining whether or not to hold a hearing on the "fairness" of an offer pursuant to N.J. Stat.Ann. § 49:5–4(a)(2).

It is the purpose of the disclosure and not its content which frustrates the purpose of the Williams Act. Furthermore, the statute provides the target company with a private cause of action to secure pecuniary and injunctive relief for any "omissions" in connection with said disclosure provisions. N.J.Stat.Ann. § 49:5–12.

### 6. *Withdrawal and Proration Periods.*

■ The withdrawal and proration rights under the New Jersey statute appear to inure to the benefit of the shareholders, but a careful analysis requires a determination that they are invalid. The Williams Act and the regulations promulgated thereunder provide that a shareholder depositing shares may withdraw them within 15 business days of the commencement of the offer. Rule 14d–7, 17 C.F.R. § 240.14d–7. The New Jersey Takeover Law confers upon shareholders the right to withdraw their shares up to three days prior to the termination of the offer, N.J.Stat.Ann. § 49:5–9(a), unless the Bureau Chief determines that further withdrawal rights are necessary. The effect of this provision ex-

tending the time for withdrawal is to delay the completion of a tender offer beyond the period prescribed by federal law. Such delay can only benefit the management of the target company and contravenes the neutral policy of the Williams Act. *See Hi-Shear*, slip op. at 10.

Similarly, the proration provisions of the New Jersey statute also delay consummation of tender offers, to the advantage, if any, of the target firm's management. The Williams Act provides that if a tender offer for less than all the outstanding equity securities of the target is oversubscribed within 10 days (not business days) of its commencement, or if an increase in the consideration is offered, then "the securities will be taken up nearly as may be *pro-rata* . . . according to the number of securities deposited by each depositor." 15 U.S.C. § 78n(d)(6). Shares deposited after the tenth day may be purchased as they are submitted. The New Jersey statute, however, provides that if the offer ever becomes oversubscribed all shares must be accepted *pro rata*. N.J.Stat.Ann. § 49:5–9(b). The effect of such a provision is to prevent the purchase of any shares until the last day that the offer is open. By extending the period during which an offeror may not buy shares, the New Jersey Takeover Law provides the incumbent management of the target with additional time to thwart an offer not contemplated by the federal scheme.

### C. *The New Jersey Takeover Law Conflicts With the Regulations of the SEC.*

The Court of Appeals for this Circuit declared that no provision of the New Jersey Takeover Law could prevent Kennecott from commencing its tender offer within five days of its November 21, 1980 public announcement. *Kennecott Corp.*, at 190–191. As the court noted, delay beyond the period prescribed by Rule 14d–2(b) causes serious injury to investors, who would otherwise be denied "their federally protected right to be informed, or their right to make a choice about the government of their cor-

poration and the disposition of their shares." *Id.* at 189. Such delay in commencement injures Kennecott as well by providing Curtiss-Wright with an opportunity to try to frustrate Kennecott's offer and by causing Kennecott to incur unrecoverable financial costs. *Id.* at 189.

The mandate of federal law, as interpreted by the Court of Appeals for this Circuit, requires this court to invalidate those provisions of the New Jersey Act that conflict with Rule 14d–2(b). These provisions include (i) the 20 day pre-commencement waiting period; (ii) the requirement that the Bureau Chief's permission to proceed must be obtained; (iii) the requirement that a hearing may be held before permission to proceed will be granted; and (iv) the automatic stay provision which could prevent the offer from proceeding even if the Bureau Chief grants his permission.

All of these provisions conflict with the regulations promulgated under the Williams Act and must therefore be invalidated. As stated by the Court of Appeals in *Kennecott Corp.*, this court must "give effect to the presumptively valid regulations of the SEC, which appear consistent with the prompt disclosure policy of the Williams Act, over contradictory state regulations." *Kennecott Corp.*, at 187 n.8.

### II. *THE NEW JERSEY TAKEOVER LAW CONSTITUTES AN UNLAWFUL BURDEN ON INTERSTATE COMMERCE.*

The Commerce Clause of the United States Constitution, U.S.Const. Art. I, § 8, cl. 3, invests Congress with authority "[t]o regulate Commerce . . . among the several States." This constitutional provision operates of its own force, creating "an area of trade free from interference by the States . . . even without implementing legislation by Congress." *Great Atlantic & Pacific Tea Co. v. Cottrell*, 424 U.S. 366, 370–71, 96 S.Ct. 923, 927, 47 L.Ed.2d 55 (1976), quoting *Freeman v. Hewit*, 329 U.S. 249, 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946).

Defendants do not dispute that Kennecott's offer, which extends to some 39,000 shareholders of Curtiss-Wright nationwide, is a transaction in interstate commerce. The Commerce Clause is the enabling authority for the Williams Act. *See* 15 U.S.C. §§ 78c(a)(17), 78n(d)(1). Nor do defendants dispute that the New Jersey Takeover Law restrains interstate commerce.

The Supreme Court has stated the standards against which state-imposed burdens on interstate commerce must be measured:

> Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities.

*Philadelphia v. New Jersey*, 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475 (1978), quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970) (the *"Pike* test"). *Accord, MITE*, 633 F.2d 486, [Current] Fed. Sec.L.Rep. (CCH) at 98,504; *Kidwell*, 577 F.2d at 1282. Thus, this court must make three inquiries: First, whether the New Jersey Takeover Law "evenhandedly" advances "legitimate local purpose[s]." Second, whether the statute's effects on interstate commerce are "only incidental." Third, whether such "incidental" effects are nonetheless "excessive in relation to the putative local benefits."

### A. Legitimate Local Purposes.

The New Jersey Takeover Law purports to protect shareholders and employees of tender offer targets. This protection is afforded by regulations which prevent a tender offeror from proceeding until the Bureau Chief has determined that the offer will not violate various substantive criteria set forth in the statute, including "fairness" to investors and the "interests" of the employees of the target company. *E. g.*, N.J. Stat.Ann. §§ 49:5–4(a)(2), 49:5–4(a)(4).

Notwithstanding such proper motives for local legislation, the New Jersey act tends to tip the scales in favor of management by permitting it to delay tender offers by its unilateral action. (*See* Section I B, *supra.*) Such parochial purposes cannot justify a burden on interstate commerce. *See Kidwell*, 577 F.2d at 1282.

Defendants do not suggest that the purported local legislation does not affect interstate commerce. The New Jersey Takeover Law is not directed exclusively or even primarily at New Jersey residents. If a target firm maintains executive offices in New Jersey, the statute undertakes to safeguard the welfare of the target's investors and employees everywhere in the country. As a result, New Jersey residents are protected, but the New Jersey Takeover Law is primarily regulation of interstate commerce with "incidental" local effects, rather than the reverse.

The *Pike* test contemplates localized regulations that have "incidental" spillover effects on interstate commerce. *E. g., Raymond Motor Transportation, Inc. v. Rice*, 434 U.S. 429, 98 S.Ct. 787, 54 L.Ed.2d 664 (1978); *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299, 13 L.Ed. 996 (1852). Such "local" purposes are characterized by numerosity and diversity that preclude "adequate" regulation by Congress. *Southern Pacific Co. v. State of Arizona*, 325 U.S. 761 at 767, 65 S.Ct. 1515 at 1519, 89 L.Ed. 1915. Here, not only has Congress acted to regulate tender offers, but the New Jersey Takeover Law does not even purport to be intrastate in its scope and effect. It is not a "local" regulation which is permissible despite the Commerce Clause.

### B. Effects on Interstate Commerce.

Even though the New Jersey Takeover Law purports to advance local pur-

1224

poses, the statute's impact on interstate commerce cannot be characterized as incidental. The statute's effects on interstate commerce are not mere spillover or fallout from local regulation. To the contrary, the law operates directly on interstate commerce and has incidental local effects.

The burden imposed upon interstate commerce is substantial. In this case, if enforced, the New Jersey Takeover Law could have prohibited or impeded a nationwide, $160 million tender offer for federally registered securities, in the face of federal laws that would permit it to go forward. The effect would not have been limited to New Jersey or its residents. On the contrary, every investor no matter where situate would have been affected.

### C. Excessive Burden on Interstate Commerce.

There is no occasion for this court to balance local benefits against interstate burdens, because this court determines that the New Jersey Takeover Law does not evenhandedly effectuate a legitimate local public interest with only incidental effects on interstate commerce. The New Jersey Takeover Law is neither "local" in purpose nor "incidental" in its effect on interstate commerce.

If such balancing were required, however, the New Jersey Takeover Law's global and arresting burdens on interstate commerce are clearly excessive in relation to putative local benefits. Assuming that New Jersey can properly protect its own citizens who are shareholders of a target firm, the state would still have no interest in the welfare of nonresidents, whom the statute also forbids from tendering shares. See MITE, 633 F.2d 486, [Current] Fed.Sec.L.Rep. (CCH) at 98,505; Kidwell, 577 F.2d at 1285; Hi-Shear, slip op. at 13.

Even as to New Jersey residents, the statute's benefits are uncertain at best. New Jersey residents are already protected by the disclosure and antifraud provisions of the Williams Act. Thus any additional benefit bestowed by the New Jersey statute is at most marginal. MITE, 633 F.2d 486,

[Current] Fed.Sec.L.Rep. (CCH) at 98,505. Moreover, the delay caused by the statute can actually harm New Jersey residents by giving incumbent management of the target an opportunity to frustrate the tender offer entirely. MITE, 633 F.2d 486, [Current] Fed.Sec.L.Rep. (CCH) at 98,505; Kidwell, 577 F.2d at 1285.

The court finds that the New Jersey Takeover Law burdens interstate commerce to a degree that is clearly excessive in relation to any putative local benefits.

Curtiss-Wright offered proof of the existence of 37 state takeover statutes. Since is it not uncommon for major companies to have plants, employees, offices and shareholders in many states, each such state could impose varying hurdles over which the tenderor would have to leap. But it is the federal government which establishes the height of the bar, and individual states cannot be permitted to raise it even though in so doing they intend to increase the standards for participants.

### III. THE ANTI–FRAUD SECTIONS OF THE NEW JERSEY TAKEOVER ACT ARE SEVERABLE.

The New Jersey Takeover statute creates delays and uncertainties not contemplated by Congress and reposes in a state official rather than the investor the acceptability of the offer. In those respects, the state act is inimical to the federal act and, therefore, it cannot co-exist. Having decided that all delays in commencing or consummating a tender offer or substituting a state official's judgment for that of the investor runs contrary to the federal statute, the question remains whether any provision of the state statute survives.

Where the legislature would have passed constitutional parts of a statute independently of those portions deemed unconstitutional and the different parts of the statute are not so intimately connected with and dependent upon each other as to make the statute one composite whole, unconstitutional parts may be rejected and the constitutional parts may stand. Lane Distribu-

*tors v. Tilton*, 7 N.J. 349, 81 A.2d 786 (1951). Severability is a question of legislative intent which must be determined on the basis of whether the objectionable feature of the statute can be excised without substantial impairment of the principal object of the statute. *Affiliated Distillers Brands Corp. v. Sills*, 60 N.J. 342, 289 A.2d 257 (1972). The remaining portions of the statute may not conflict with the overall basic purpose of the legislature in enacting the statute. *New Jersey Chapter, Am. Institute of Planners v. New Jersey State Board of Professional Planners*, 48 N.J. 581, 227 A.2d 313, *appeal dismissed, cert. denied*, 389 U.S. 8, 88 S.Ct. 70, 19 L.Ed.2d 8 (1967). Even where a statute has a severability clause, it is necessary to determine whether the legislature would have enacted the remaining sections of the statute without the objectionable part. *Group Health Ins. of New Jersey v. Howell*, 40 N.J. 436, 193 A.2d 103, *supplemented*, 43 N.J. 104, 202 A.2d 689 (1963).

Defendants suggest several methods to revise the statute and preserve some of its provisions, but to adopt those suggestions would emasculate the Act and ignore its intent and purpose. The statute contains a severability provision as follows in § 49:5–18:

> If any provision of this act, or any application of any provision, is held invalid, the invalidity shall not affect other applications of the provision, or other provisions of the act, which reasonably can be given effect despite the invalidity.

The only sections which may survive after removing the act's vital organs are the anti-fraud provisions to the extent they are not inconsistent with the conclusions set forth hereinabove. The hearing procedure outlined in the statute contemplates a pre-commencement determination by the Bureau Chief. The purpose of the hearing, if ordered, is to determine whether or not the offer will be permitted to proceed. The thrust of the New Jersey statute is directed at a determination as to whether or not the offer shall go forward. If those sections which pertain to pre-commencement activities are deleted, little remains of any substance. To amend the statute to provide for a post-commencement hearing would be to enact legislation never intended by its proponents.

 The anti-fraud provisions standing alone may not carry out the intent of the New Jersey Legislature. However, that issue may be resolved by such legislature and need not be determined by this court. Said sections are not unconstitutional and may serve some appropriate function. In all other respects, the statute is declared unconstitutional for the reasons expressed hereinabove, and the defendants are permanently enjoined from seeking to enforce said provisions of the statute.[2]

Jersey Takeover Law violates the First Amendment.

---

2. By virtue of said determination, the court has not ruled on plaintiff's contention that the New