**NUI CORPORATION, a New Jersey corporation, Plaintiff,**

v.

**Irwin I. KIMMELMAN, Attorney General of the State of New Jersey and New Jersey Resources Corporation, a New Jersey corporation, Defendants.**

Civ. No. 84-0411 S.

United States District Court,
D.New Jersey.

Sept. 10, 1984.

---

Laurence B. Orloff, Orloff, Lowenbach, Stifelman & Siegel, P.A., Roseland, N.J., for plaintiff.

Irwin I. Kimmelman, Atty. Gen., of New Jersey, Div. of Law by Claude E. Salomon, Deputy Atty. Gen., Newark, N.J., for defendant Kimmelman.

Richard B. McGlynn, Stryker, Tams & Dill, Newark, N.J., for defendant New Jersey Resources Corp.

## OPINION

STERN, District Judge.

An expensive and bitter proxy contest for control of New Jersey Resources Corporation is the backdrop for the renewed warring in this Court. Faced today with a number of motions from all parties, we hold that plaintiff, whose slate of nominees was defeated in the election following the proxy battle, is entitled to a new election. We base our decision on our finding that a recently enacted state statute affecting proxy solicitation, lobbied for and promoted by New Jersey Resources Corporation, is unconstitutional.

### I.

#### A. *Introduction*

NUI Corporation ("NUI") and New Jersey Resources Corporation ("NJR") are publically-owned exempt public utility holding companies organized under the laws of New Jersey, whose stocks are traded on the New York Stock Exchange. NUI, engaged primarily in the discovery, development and distribution of natural gas, has as its principal subsidiary Elizabethtown Gas Company. NJR, engaged in similar activities with respect to natural resources, has as one of its principal subsidiaries New Jersey Natural Gas Company. The shareholders of these two corporations reside in various states and foreign countries. NUI owns approximately 155,488 shares of NJR's common stock, which represents less than 5% of NJR's outstanding stock.

On November 16, 1983, NUI proposed a merger to the management and Board of Directors of NJR, which offer was rejected one week later. NUI made another offer on November 30 to negotiate a merger, on terms it deemed to be more favorable to NJR, but this too was turned down by NJR on December 1. On this same day, NUI announced its intention to solicit proxies for the election of seven NUI nominees to the eleven-member NJR Board at the annual shareholders meeting of NJR scheduled for January 6, 1984 (subsequently rescheduled to February 2, 1984). NUI states that its express purpose for soliciting proxies was to elect a majority of NJR Directors favoring an NUI–NJR merger.

The proxy battle that began on December 1, 1983, perhaps the costliest in New Jersey history, was fiercely contested. It is plaintiff's contention that during the two-month course of this contest, two in-

terrelated series of events ultimately caused NUI to lose its bid for control of NJR. First, NUI alleges that from the time it announced its intention to solicit proxies through the election date, NJR engaged in a pattern of conduct that was designed to, and did in fact, materially confuse and mislead NJR shareholders, in an effort to defeat NUI's attempt to elect a majority of directors in favor of a merger. Second, NUI asserts that N.J.Stat.Ann. § 48:2–51.1, titled "An Act concerning the acquisition of control of public utilities, and supplementing Title 48 of the Revised Statutes" ("the statute"), passed on January 31, 1984, is unconstitutional, and that its enactment contributed to NUI's defeat in the election held two days later. Even if the statute is constitutional, NUI contends that the election must be invalidated due to NJR's failure to comply with its terms.

*B. December 1, 1983—January 29, 1984*

Following NUI's announcement that it would solicit proxies to elect a pro-merger slate of NJR directors, NJR filed a petition with the New Jersey Board of Public Utilities ("BPU") on December 7, 1983, in which NJR alleged that NUI's proxy solicitation was illegal and should not be permitted without BPU approval. It appears that NJR based its petition upon two existing statutes—N.J.Stat.Ann. §§ 48:3–7, 3–10— which provide that no public utility shall merge its property or franchise with any other public utility, nor transfer on its books a change in majority ownership of its stock to any corporation without approval by the BPU.[1] On December 20, 1983, NJR filed an emergent petition with the BPU seeking to restrain NUI from continuing its proxy solicitation in the absence of BPU permission. After a hearing held on January 17, 1984, at which NUI argued, among other things, that § 48:3–10 did not require

BPU approval of NUI's proxy solicitation, NJR withdrew its request that the BPU restrain NUI from further proxy solicitation. By order of January 27, 1984, the BPU denied NJR's request that the shareholder meeting be delayed until the BPU passed on the merits of a proposed merger of the holding companies and their utility subsidiaries. The BPU ruled that it had jurisdiction to approve or disapprove a merger at a time following the scheduled February 2, 1984 election.

During the course of these BPU proceedings, plaintiff alleges that NJR engaged in a campaign of misleading proxy solicitation, focused primarily on the attempt to create the impression among shareholders that NUI's efforts to elect its nominees, and ultimately to effect a merger, were illegal. Plaintiff points to a proxy solicitation letter dated January 5, 1984, which stated in bold print: "DON'T BE MISLED—NUI HAS NOT AND CANNOT LEGALLY MAKE AN OFFER TO BUY YOUR STOCK AND MAY NEVER BE ABLE TO." In smaller print the letter noted that NUI could only make its definitive merger offer if a number of conditions were met, including BPU approval, shareholder ratification, and antitrust clearance from the Department of Justice and Federal Trade Commission. The letter also noted that NJR had petitioned the BPU to consider whether NUI could proceed with its proxy solicitation.

Plaintiff also cites similar warnings made by NJR to its shareholders in advertisements placed in The Star Ledger, The Wall Street Journal, and The Asbury Park Press on January 9, 1984. As in the earlier January 5 letter, a bold-face "DON'T BE MISLED" caption was followed by several statements calling into question the legality of NUI's proxy solicitation efforts. An

---

**1.** N.J.Stat.Ann. § 48:3–7 states in relevant part: No public utility shall, without the approval of the board, sell, lease, mortgage or otherwise dispose of or encumber the property, franchises, privileges or rights, or any part thereof; or merge or consolidate its property, franchises, privileges or rights, or any part thereof, with that of any other public utility.

N.J.Stat.Ann. § 48:3–10 states in relevant part: No public utility ... shall sell, nor shall any such public utility make or permit to be made upon its books any transfer of any share or shares of its capital stock, to any other public utility, unless authorized to do so by the board.

additional newspaper advertisement of January 17, a mailgram dated January 17 sent by NJR to its shareholders, and another NJR mailing to shareholders on January 25, all contained what NUI claims was misleading information regarding the lawfulness of NUI's proxy activities.

On January 23, 1984, NJR broadcast an advertisement on WINS radio station in New York, in which NJR President Dolan stated:

NUI Corporation has launched a costly proxy contest to take control of New Jersey Resources. NUI says that it wants to merge the two companies, but the fact is that NUI has not made a legal offer to buy your stock, and may never be able to.

The rest of the statement was devoted not to explaining the basis for doubting the legality of the merger, but instead to outlining NJR's position that the business prospects of the company would be brighter in the absence of a merger.

NUI charges that NJR, in addition to creating the false spectre of NUI's unlawfulness, openly campaigned for the passage of N.J.Stat.Ann. § 48:2–51.1, and, moreover, actively promoted to its shareholders the fact that the legislation was pending and that such legislation might preclude NUI's participation in the proxy contest. NUI cites a January 27, 1984 press release issued by NJR that purportedly conflates the BPU's January 27 ruling and the existence of the pending legislation in a way that would mislead shareholders with respect to NUI's proxy activities.

As further examples of misleading proxy material issued by NJR, NUI cites NJR's December 21, 1983 proxy solicitation letter quoting a Standard & Poor's announcement which placed Elizabethtown Gas Company and New Jersey Natural Gas Company on its "Credit Watch" due to "negative credit implications" resulting from the proposed NUI–NJR merger. NUI claims that the proxy letter was misleading in that it failed to include the additional statement in the Standard & Poor's announcement that "the

combined entity would benefit from a more diversified long-term gas supply position."

Plaintiff also alleges that NJR, in proxy material placed in newspaper advertisements, made reference to a January 13, 1984 Value Line Investment Survey report which stated, "NUI's stock has little appeal at the present time in our opinion" and that NUI's "prospects to 1986–88 are far from clear." On January 27, however, Value Line issued a supplemental report on NUI, concluding in part that NUI stock was expected to be "an above-average performer over the next 12 months." NUI argues that NJR's failure to correct its prior advertisements, and NJR's practice of continuing to run advertisements quoting the initial Value Line report after the supplemental report was issued, were misleading to shareholders.

### C. January 30—February 2, 1984

On January 30, 1984, the New Jersey legislature passed Assembly Bill A–826, which was signed into law on January 31 by the Governor of New Jersey. The Bill, now codified at N.J.Stat.Ann. § 48:2–51.1, provides as follows:

AN ACT concerning the acquisition of control of public utilities, and supplementing Title 48 of the Revised Statutes.

BE IT ENACTED by the Senate and General Assembly of the State of New Jersey:

1. No person shall acquire or seek to acquire control of a public utility directly or indirectly through the medium of an affiliated or parent corporation or organization, or through the purchase of shares, the election of a board of directors, the acquisition of proxies to vote for the election of directors, or through any other manner, without requesting and receiving the written approval of the Board of Public Utilities. Any agreement reached, or any other action taken, in violation of this act shall be void. In considering a request for approval of an acquisition of control, the board shall evaluate the impact of the acquisition on

competition, on the rates of ratepayers affected by the acquisition of control, on the employees of the affected public utility or utilities, and on the provision of safe and adequate utility service at just and reasonable rates. The board shall accompany its decision on a request for approval of an acquisition of control with a written report detailing the basis for its decision, including findings of fact and conclusions of law.

2. This act shall take effect immediately.

The Bill included a "Statement" which read:

The purpose of this bill is to clarify current law to confirm that the direct or indirect acquisition of control of any public utility requires the prior approval of the Board of Public Utilities. In addition, the bill requires prior written approval by the board before any action is taken to seek to acquire control of any public utility. This bill also provides that in the course of evaluating a request for approval of any acquisition of control, the Board of Public Utilities would consider the impact of acquisition of control on utility rates, competition, the employees of the affected utility, and the provision of safe and adequate service at just and reasonable rates.

NUI claims that once the statute was passed on January 31, NJR gave out "mixed and confusing messages" designed to leave the impression that NUI's proxies might not be legal, and hence not counted at the February 2 meeting. NUI alleges in the amended complaint that NJR, through

its proxy solicitors, informed shareholders that the newly-passed statute precluded NUI from proceeding with the proxy contest and from voting its shares in the absence of BPU approval.

NUI states that on February 1, NJR presented it with the text of a proposed agreement between the two companies that would govern the manner in which the annual meeting, scheduled for the next day, would be conducted. This proposal, according to NUI, included a demand that NUI acknowledge the enactment of the statute currently in question, concede that the statute made NUI's proxy solicitation illegal, agree to indemnify and hold NJR harmless regarding anything that transpired at the meeting as a result of the statute, and recognize that NJR would ultimately decide whether to count the proxies. NUI declined to sign this proposal, and instead came before the Court on this same day, asking that the shareholders meeting and election be enjoined based on the contention that § 48:2–51.1 is unconstitutional.

At the February 1 hearing, defendant Kimmelman took the position that the State, through the BPU, would not seek to enforce the statute for the purposes of the NJR election, and defendant NJR stated that it would not seek to have NUI's proxies disallowed. NUI protested this concession as an inadequate assurance of an untainted election, stressing at the same time how NJR's position in particular represented a complete retreat from its stance up to this point that the statute would most definitely bar NUI from soliciting and voting proxies.[2] NUI brought to the Court's at-

---

**2.** Counsel for NJR made perfectly clear at the February 1 hearing that NJR had enthusiastically lobbied for the passage of the statute, with the hope that it would go into effect prior to the annual meeting and election, as is revealed in the following dialog:

THE COURT: Did you people participate in the passage of [the] statute by urging—
MR. McGLYNN: Yes.
THE COURT: Did you do that through this proxy fight?
MR. McGLYNN: We did it in a view to this proxy fight and in part to—certainly in part to our concern. I'm sorry.

THE COURT: Was the timing of this legislation in any way influenced by you in respect to the election which is being held tomorrow?
MR. McGLYNN: We tried to have this statute passed as expeditiously as possible. Just so your Honor understands—
THE COURT: Because of the election tomorrow?
MR. McGLYNN: It was because of the proxy fight. I can't say—
THE COURT: I mean because of the proxy fight which culminates in the election tomorrow?
MR. McGLYNN: Surely. Certainly....

Tr. of February 1, 1984 at 31.

tention the fact that it had already stopped its proxy solicitation upon learning of the statute's passage. The Court, emphasizing the short notice on which it was being asked to decide significant and complicated constitutional questions, declined to grant preliminary injunctive relief on the ground that irreparable harm to plaintiff had not yet been demonstrated. The Court stated that if NUI did, in fact, lose the next day's election, it could return to Court to argue that an unconstitutional statute had contributed to its defeat.

On February 2, 1984, the annual NJR shareholders meeting took place. Plaintiff complains that at the meeting, NJR President Dolan improperly predicted victory for NJR's slate of directors by stating, "[W]e have had a long history of stockholder loyalty and support, and it will be the same stockholder support that will cause us to win this proxy contest." The election went forward, with approximately 91% of all outstanding shares voted. The result was victory for NJR: roughly 63% of the votes cast were in favor of the incumbent NJR Board, while 37% of the votes cast were in favor of the slate of directors proposed by NUI. A little over two months later, NUI filed an amended complaint; the present motions followed.

## II.

### A. The motions

Plaintiff's amended complaint contains five counts. Counts One and Two, brought pursuant to § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), and Rule 14a–9(a), 17 C.F.R. § 240.14a–9(a) (1983), promulgated thereunder, recite the series of statements made and actions taken by NJR in the period prior to the election that purportedly resulted in the misleading of shareholders. Counts Three and Four allege that the statute passed on January 31, 1984, impermissibly constrains proxy solicitation in violation of the Supremacy Clause, the Commerce Clause and the first amendment to the Constitution.

Count Five alleges alternatively that if the statute is constitutional, NJR's failure to comply with its terms is cause for invalidation of the election.

Defendant Kimmelman, joined by defendant NJR, has moved to dismiss on several jurisdictional theories. In addition, defendant NJR moves for judgment on the pleadings as to Counts One and Two of the amended complaint, the claims seeking compensatory and injunctive relief for alleged violations of Rule 14a–9(a). Plaintiff and defendants have cross-moved for partial summary judgment on Counts Three and Four, the claims seeking a new election due to the alleged unconstitutionality of § 48:2–51.1. Finally, defendant NJR moves to dismiss Count Five, the claim asking for a new election on the grounds that NJR did not itself comply with the dictates of § 48:2–51.1.

### B. Defendant Kimmelman's motion to dismiss: case or controversy, standing, mootness, arising under jurisdiction

Defendant Kimmelman moves to dismiss Counts Three and Four, the only counts in which he is named, on a variety of jurisdictional grounds. These interrelated arguments share an analytical theme, which can be expressed in the following proposition: Since neither the Attorney General nor the BPU has ever threatened or taken action against NUI or its agents as a result of any events taking place during the proxy fight, NUI has no basis to bring suit on the statute. Thus defendant Kimmelman argues, "Plaintiff merely alleges that it was exposed to putatively illegal conduct by the existence of the statute; this allegation without apparent harm, is simply not enough to bring it within the confines of federal court jurisdiction." Br. of Def. Kimmelman at 10.

To unravel defendant Kimmelman's arguments, we must first recast the characterization of plaintiff's amended complaint. Defendant incorrectly contends

that plaintiff alleges no "apparent harm"— plaintiff most specifically claims that it lost an election due, in part, to the passage of an unconstitutional statute. Moreover, in addition to plaintiff's argument that the mere existence of the statute served to confuse shareholders as to the legality of NUI's proxy efforts, plaintiff alleges that it expressly halted its proxy solicitation upon the passage of the statute which, accordingly, undermined its election undertakings. We find that plaintiff has clearly presented a live case or controversy.

■ We correspondingly hold that plaintiff has standing to maintain this action. As recently restated in *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982):

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1925, 48 L.Ed.2d 450 (1976).

In this case, plaintiff has not raised a mere academic question of a statute's constitutionality for the Court's advisory consideration—rather, plaintiff has claimed that an unconstitutional statute both affected its behavior (in terms of proxy solicitation) and altered the course and result of an election in a manner detrimental to NUI. We hold that plaintiff need allege no more in order to satisfy traditional notions of standing.[3] While defendant Kimmelman would require that plaintiff prove with certainty that the statute caused NUI to lose the election in order to establish its standing to bring this action, we think such a requirement demands too much. Plaintiff need not prove liability as a prerequisite to bringing a lawsuit. Plaintiff has alleged sufficient injury attributable to defendants to allow this suit to continue.[4]

■ Defendant Kimmelman further argues that Counts Three and Four do not "arise under" the Constitution or federal law because they merely assert a federal defense to a possible future state enforcement of the statute in question. While the general task of defining the contours of those cases "arising under" the Constitution, laws, or treaties of the United States has been aptly likened to the task of the daughters of Danaus, *see Stone & Webster Engineering Corp. v. Ilsley*, 690 F.2d 323, 328 n. 4 (2d Cir.1982), the Third Circuit has announced in a more specific context that a complaint seeking a declaratory judgment that federal law preempts state regulation does not state a cause of action arising under federal law when the federal issue is simply in the nature of a defense to a state law claim. *See Exxon Corp. v. Hunt*, 683 F.2d 69, 73 (3d Cir.1982), *cert. denied*, 459 U.S. 1104, 103 S.Ct. 727, 74 L.Ed.2d 952 (1983); *but see Stone & Webster Engineering Corp.*, 690 F.2d at 327 (questioning "narrow" view of "arising under" jurisdiction advanced by courts including the Third Circuit). Thus, we do not quarrel with

---

**3.** It is significant to note that had the statute been on the books months, or even weeks before the scheduled election, the Court would have been in the position to reach the merits of plaintiff's application before the election. Had this been the procedural posture of the case, defendants obviously would have been unable to argue that plaintiff lacked standing to sue. We refrained from enjoining the election in part because the constraints of time precluded adequate deliberation over important constitutional issues. At the moment when plaintiff asked the Court to stop the next day's election, we were even without any written response from defendants. The fact that the election was held, however, does not deprive plaintiff of standing to complain of that which it earlier had predicted—that the presence of the statute infected the proxy battle and the election.

**4.** Because we reject defendant Kimmelman's description of plaintiff's amended complaint, for the reasons stated above, we clearly cannot find this case to be moot.

defendant Kimmelman's formulation of the law. Once more, however, we differ in our characterization of plaintiff's action. Were plaintiff simply seeking a declaration that § 48:2–51.1 is unconstitutional because it is preempted by federal proxy regulations, thereby attempting to stave off a prospective state enforcement proceeding, we might have cause to hesitate in retaining jurisdiction. But NUI's amended complaint reveals and seeks much more. Plaintiff attacks the statute under the Supremacy Clause, the Commerce Clause and the first amendment,[5] not merely as a "federal defense" to a feared future enforcement action, but rather as a means to redress perceived wrongs: the stifling of its proxy efforts and the loss of the shareholders election. In addition to declaratory relief, plaintiff seeks affirmative injunctive relief, both in the form of a new election and against future enforcement of the statute. We find this case to be factually distinct from *Exxon Corp.*, and cases cited therein, and conclude that subject matter jurisdiction is properly grounded in 28 U.S.C. § 1331.[6]

*C. Defendant NJR's motion for judgment on the pleadings on Counts One and Two*

■ Defendant NJR moves pursuant to Fed.R.Civ.P. 12(c) for judgment on the pleadings as to Counts One and Two, arguing that even if every factual allegation in the amended complaint is assumed to be true, NJR is entitled to judgment as a matter of law. Because matters outside the pleadings have been presented on this motion (e.g., statements made by counsel at the February 1, 1984 hearing), the motion will be converted to one for summary judgment. *See* 5 C. Wright & A. Miller, Federal Practice & Procedure, § 1369 (1984).

Rule 14a–9(a), 17 C.F.R. § 240.14a–9(a), promulgated by the Securities and Exchange Commission pursuant to authority granted by the Securities Exchange Act of 1934, 15 U.S.C. § 78n,[7] prohibits the use of false or misleading statements or omissions with respect to a registered security, stating:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

Defendant NJR maintains that none of its proxy statements were in any way false or misleading.

Defendant NJR argues that the statement, "NUI has not and cannot legally make an offer to buy your stock and may

---

5. Defendant Kimmelman concedes that plaintiff's first amendment claim entails more than a "federal defense", but suggests that the argument is frivolous. Although we do not today reach the merits of plaintiff's first amendment claim, *see infra* at 1471 n. 16, we cannot agree that the argument is so frivolous as to deprive this Court of subject matter jurisdiction. *See Kennecott Corp. v. Smith*, 637 F.2d 181, 190 n. 10 (3d Cir.1980).

6. Defendant Kimmelman moves to dismiss that part of Count Four that seeks relief based on state law. Plaintiff concedes that such relief is barred by *Pennhurst State School & Hospital v. Halderman*, —— U.S. ——, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).

7. Section 14(a), 15 U.S.C. § 78n(a) states:
   It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78*l* of this title.

never be able to", is true; since NUI had never, in fact, made an offer to NJR shareholders for their shares, nor was it a certainty that in the future NUI would be able to satisfy various state and federally imposed conditions that are required before consummating a merger. NJR denies that this statement, which was repeated in a number of its solicitations, implied that NUI's proxy solicitation was illegal, stating, "Any reasonable shareholder reading NJR's proxy material would immediately recognize a difference between the assertion that NUI had not made an offer to buy NJR stock and a statement that NUI's proxy solicitation was illegal." Br. of Def. NJR at 23. NJR makes the additional alternative arguments that NUI's position on the "legality" of its proxy efforts was widely reported and that NUI failed to "correct" NJR's statements until two months after NUI lost the election.

With regard to NUI's additional allegations of proxy violations, NJR maintains first that its filing a petition with the BPU and its lobbying of the New Jersey legislature for passage of § 48:2–51.1 do not constitute "solicitations" for purposes of Rule 14a–9(a), because these activities were not communications with security holders. As for the "CreditWatch" and Value Line quotations, NJR cites the generally accepted precept that proxy statements need not be perfect, and that, therefore, NJR was neither required to print the entire "Credit-Watch" report nor to update the Value Line evaluation. NJR contends that the statement made by President Dolan at the annual meeting did not constitute an unlawful victory prediction, but rather presented a more modest expression of corporate self-confidence. Finally, NJR posits that statements made by counsel for NUI at the February 1 hearing serve to "negate" NUI's Rule 14a–9(a) claims. At that hearing, the following dialog occurred:

The Court: The whole thrust of your argument, as I understand it, you believe the air has been poisoned by the statute.

Mr. Schwarz: I believe that—with all respect, your Honor, that understates the problem here.

The Court: What?

Mr. Schwarz: I'll explain why. That "poisoning" language your Honor uses is commonly used in cases where one side is saying something about the other. They've made some misstatements about us. They've made an attack on our candidates or something about us which I haven't had a chance to answer it. Something of that sort.

Your Honor, that is not this case. In this case the public perception—I will document this—all outside this courtroom is that we can't participate in the meeting at all. I don't think there has ever been such a case.

Tr. of Feb. 1, 1984 at 19–20. NJR argues that NUI, through counsel, specifically stated that this case was not about misstatements, but rather about an allegedly unconstitutional statute, and thus NUI should not now be permitted to go forward with its Rule 14a–9(a) claims.

On this motion, NJR asks the Court to find, as a matter of law, that not one of the statements or omissions in NJR's proxy materials cited by plaintiff was misleading, or, if it was, that it was not material within the meaning of Rule 14a–9(a). This we cannot do. Whether NJR's statements concerning the "legality" of NUI's merger hopes were technically correct does not address the deeper problem of whether they were misleading. This is at best a mixed question of law and fact which cannot be resolved on a motion for summary judgment. *See Gould v. American-Hawaiian Steamship Co.,* 535 F.2d 761, 771 (3d Cir. 1976) (summary judgment inappropriate where alleged misrepresented facts, and the inferences to be drawn therefrom, are not free from controversy). We simply cannot agree with NJR's conclusion that any reasonable shareholder would "immediately recognize a difference between the assertion that NUI had not made an offer to buy NJR stock and a statement that NUI's proxy solicitation was illegal." We note that, roughly contemporaneous with NJR's proxy solicitation, NJR was petition-

ing the BPU to stop NUI's proxy efforts for alleged noncompliance with applicable regulations, as well as publicly promoting legislation that, in NJR's view, would prohibit NUI's proxy solicitation in the absence of BPU approval. Given the obvious and pervasive commingling of the two issues—NUI's attempts to achieve an NUI-NJR merger and NUI's proxy solicitation—fostered largely by NJR itself, we conclude that plaintiff's claim that NJR created a misleading aura of unlawfulness around NUI's proxy solicitation clearly raises factual issues unsuitable for resolution at this time.

■■■ With regard to the additional bases for plaintiff's Rule 14a–9(a) claims—the "CreditWatch" and Value Line quotations and the Dolan statement—we find that the principal issue involved is their materiality. A misleading statement or omitted fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . ." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976); *Gould*, 535 F.2d at 771. Characterized in *TSC Industries* as a mixed question of law and fact, the determination of materiality "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Industries*, 426 U.S. at 450, 96 S.Ct. at 2132. Thus, only if the misstatements or omissions are " 'so obviously important to an investor, that reasonable minds cannot differ on the question of materiality' is the ultimate issue of materiality appropriately resolved 'as a matter of law' by summary judgment." *Id.* (quoting *Johns Hopkins University v. Hutton*, 422

F.2d 1124, 1129 (4th Cir.1970)). At this stage of the proceedings, we are not in a position to hold that within the "total mix" of information available to the NJR shareholders, *see id.* 426 U.S. at 449, 96 S.Ct. at 2132; the alleged misstatements and omissions would have been of no importance to the reasonable shareholder in deciding how to vote.[8] Accordingly, defendant NJR's motion will be denied.

■■■ As a final matter, we reject defendant NJR's argument that statements made by counsel for NUI at the February 1 hearing "negate" NUI's claims contained in Counts One and Two. At that hearing, NUI was seeking a temporary restraining order preventing the election from taking place the following day, solely on the ground that the recently-enacted statute was unconstitutional; the § 14(a) claims were not at issue. We are not persuaded that NUI counsel's isolated statement— "that is not this case" (referring to allegations of misstatements made in proxy solicitation), *see supra* at 1466—made in the context of a narrow constitutional argument, forever bars plaintiff from amending, supplementing or correcting its legal theories in the larger case to include claims under § 14(a).

### D. Cross-motions for partial summary judgment on Counts Three and Four

Counts Three and Four of the amended complaint allege that the statute enacted on January 30, 1984, violates the Supremacy Clause, the Commerce Clause and the first amendment. Defendant NJR, joined by defendant Kimmelman, moves for summary judgment on these counts on the renewed contention that the statute had no effect on the outcome of the election. Relying on the report and affidavit of Vincent

---

**8.** We agree with NJR that its proceeding before the BPU and lobbying activities do not constitute "solicitations" within the meaning of Rule 14a–1. *See* 17 C.F.R. § 240.14a–1(f)(1) (1983). NUI argues, however, that certain communications by NJR, such as the January 5 proxy letter, discussed these activities in a way which reenforced the false spectre of NUI's illegal proxy activities. While we find that NJR's activities before the BPU and the New Jersey legislature do not themselves provide a basis for relief under Rule 14a–9(a), to the extent that NUI is claiming that NJR's statements concerning these events, as made in proxy solicitations, were materially misleading, we cannot grant summary judgment in favor of defendant NJR for the reasons discussed above.

J. Love, one of two inspectors of the February 2, 1984 election, NJR argues that even if all of the shares voted for NJR nominees by proxies on or after January 30 had been voted instead for NUI nominees, the final outcome of the election would have been the same. NJR thus concludes that the passage of the statute had no demonstrable effect on the election, thereby warranting summary judgment in favor of defendants on Counts Three and Four. We reject NJR's argument.

First, implicit in NJR's position is the formulation of a legal standard we decline to adopt. NJR maintains that NUI must prove that the statute had a decisive effect on the election outcome. Such a standard would impose a greater burden on NUI in proving its constitutional claims than in its Rule 14a–9(a) claims, since to establish the latter it need not demonstrate that a misstatement or omission actually had a determinative effect on the voting so long as it had a "significant *propensity* to affect the voting process." *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970). In the unique circumstances of this case, we see no reason to embrace a test more stringent for plaintiff's constitutional claims than that established in *Mills*, particularly in light of the practical difficulties which inveigh against a subjective standard. *See id.* at 385, 90 S.Ct. at 622.[9]

■ Given the facts before us, we find that if the statute is unconstitutional, the requisite causality has been demonstrated. Our conclusion is based not on the conflicting affidavits of the parties as to whether shareholders were affected in their voting by the passage of the statute. Rather, we are impressed by the undisputed fact that plaintiff submitted to the command of the statute passed on January 31, and stopped its proxy solicitation until after the hearing on February 1, at which time defendants stated that they would not seek the statute's enforcement. Thus, for a short but critical moment in the life of the proxy war, NUI was blocked. If the statute causing so much furor is unconstitutional, we cannot but conclude that plaintiff is entitled to a new election.

Finally, we find it disingenuous for NJR to defend against plaintiff's constitutional attack by proclaiming the ineffectuality of the statute. As is clear from NJR's own admissions, NJR vigorously lobbied for and actively publicized that statute as a direct means of vanquishing NUI in the proxy battle. Until the February 1 hearing (and possibly afterward, *see* Affidavit of Edward D. Herlihy), NJR took the position that the statute precluded NUI from voting its proxies absent BPU approval. Indeed, NJR's affirmative support and promotion of the statute as one tactic to thwart NUI is itself meaningful evidence of the propensity of the statute to affect the voting process. Having benefited from any confusion created by the heralding and passage of the statute, NJR now protests that it needed no help from such chaos in securing its victory. It is too late for NJR to cleanse its triumph, if indeed the statute in question is unconstitutional. To this question we now turn.

Plaintiff's constitutional assault on § 48:2–51.1 begins with the Supremacy Clause, U.S. Const. art. VI, cl. 2,[10] and

---

**9.** Even were we to accept the reasoning of NJR, we are not convinced that the Love Affidavit definitively establishes that the statute had no bearing on the outcome of the election. It is certainly possible that some number of NJR proxies voted before January 30, 1984 were influenced by the anticipated passage of the statute and the projected consequences to NUI's proxy efforts. Additionally, in the absence of the enactment of the statute, the number of proxy revocations may have been significantly different. Plaintiff NUI has, in fact, submitted the affidavit of, among others, Harry O'Neill, President of Opinion Research Corporation,

which cites the findings of a poll indicating that some NJR voters were influenced by their uncertainty concerning the legality of NUI's actions. While we do not unqualifiedly accept plaintiff's proof, we simply note that the evidence to date does not ineluctably reveal that the election outcome was necessarily unaltered by the passage of § 48:2–51.1.

**10.** U.S. Const. art. VI, cl. 2 states:
   This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall

plaintiff's contention that the New Jersey statute in question impermissibly frustrates the goals of federal proxy regulations.[11]

■ It is clear that a state statute is void not only to the extent that it actually conflicts with a federal statute, but also where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Brown v. Hotel and Restaurant Employees and Bartenders International Union, Local 54,* ── U.S. ──, ──, 104 S.Ct. 3179, 3186, 82 L.Ed.2d 373 (1984) (quoting *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). In order, therefore, to determine whether N.J. Stat.Ann. § 48:2–51.1 impedes the effectuation of Congress' purpose in enacting the federal proxy laws, we must first explore the nature of that purpose before examining the interplay of the state and federal schemes.

As stated in *J.I. Case Co. v. Borak,* 377 U.S. 426, 431, 84 S.Ct. 1555, 1559, 12 L.Ed.2d 423 (1964):

> The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange." H.R. Rep. No. 1383, 73d Cong., 2d Sess., 13. It was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which ... [had] frustrated the free exercise of the voting rights of stockholders." *Id.* at 14.

Implicit in the concepts of full disclosure and "fair corporate suffrage" is a sense of an overall process, a democratic ideal for corporate governance essential for the protection of investors. *See id.* at 432, 84 S.Ct. at 1559. Full disclosure and fair access to the shareholders, critical components of the federal regulation of proxies, help guarantee both that investors may intelligently vote their shares and that neither management nor any challengers will benefit from the now-forbidden practice of false or misleading solicitation of shareholders. Thus, we come to the rather simple conclusion that the federal proxy laws establish and ensure fairness—to the investor as well as to those actors competing for the investor's vote. We are in complete agreement with Professor Loss, who notes that an unregulated corporate proxy system is "an open invitation to self-perpetuation and irresponsibility of management," and who concludes:

> A major problem in any system of proxy regulation is the equalization, so far as practicable, of the rights of management and of opposition security holders. The SEC rules attack this problem in three ways: (a) by assuring access to fellow security holders, (b) by imposing special requirements on all participants in *contested* elections, and (c) by opening the management's own proxy statement to legitimate proposals of security holders.

L. Loss, Fundamentals of Securities Regulation, 509, 525 (1983); *see also Reserve Life Insurance Co. v. Provident Life Insurance Co.,* 499 F.2d 715 (8th Cir.1974) (section 14(a), and rules promulgated thereunder, provide that competing interests are furnished equal opportunities to communicate with and influence shareholders), *cert.*

be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

**11.** Section 28(a) of the 1934 Act, 15 U.S.C. § 78bb(a) states in relevant part:

Nothing in this chapter shall affect the jurisdiction of the securities commission (or any agency or officer performing like functions) of any State over any security or any person insofar as it does not conflict with the provisions of this chapter or the rules and regulations thereunder.

*denied*, 419 U.S. 1107, 95 S.Ct. 778, 42 L.Ed.2d 803 (1975).[12]

Having explicated the broad purposes underlying the federal proxy rules, we turn to the specific challenge to the New Jersey statute. It is plaintiff's contention that the statute disrupts any equilibrium between the incumbent management and a challenger in a proxy battle for control of a public utility by unilaterally burdening the insurgent with the ordeal of administrative proceedings. More specifically, plaintiff argues that under § 48:2–51.1, a challenger seeking to acquire control of a public utility through the acquisition of proxies is prohibited from proxy solicitation prior to obtaining BPU approval of its merger proposal; the incumbent management, however, suffers no restriction in communicating with its shareholders. So viewed, § 48:2–51.1 confers upon incumbent management a significant advantage in its proxy battle by allowing it to communicate its position to shareholders without interruption or rebuttal, and by affording it time to prepare a takeover defense, while the muzzled challenger waits for the BPU to approve its bid for control. It is conceivable that under the statute a challenger could be detained in BPU approval proceedings from the time the record date is set by management[13] through the election itself, foreclosing the opportunity to solicit proxies altogether.[14] Even where a challenger is given approval by the BPU to solicit proxies for the purpose of gaining ultimate control over the corporation, it may be greatly disadvantaged by the incumbent management's head start.

■ Having established that an important purpose of the federal regulatory scheme governing the corporate proxy is to neutralize any inherent situational advantages enjoyed by the incumbent management by promoting equal and honest access to shareholders, we cannot ignore the obstacles the New Jersey statute introduces to the accomplishment of that goal. Notwithstanding defendant Kimmelman's assurances that the BPU approval proceedings as mandated by the statute will be conducted expeditiously, *see, e.g.,* Affidavit of Blossom A. Peretz, there is no question that for at least some period of time a challenger may not communicate with shareholders, even though no such silencing extends to management. Depending on the degree of complication involved in a challenger's application, it is conceivable that the delay in allowing proxy solicitation could effectively eliminate the challenger's opportunity to prevail at an election. The New Jersey statute at issue, by disrupting the evenhanded approach to proxy solicitation set out in the federal rules—designed to protect the investor by, in part, striking a balance between existing management and those who would seek to control—impedes the execution of Congress' and the SEC's objectives underlying § 14(a) and Rule 14a–9(a). *See National City Lines, Inc. v. LLC Corp.,* 524 F.Supp. 906 (W.D. Mo.1981) (Missouri Insurance Act, requiring challenger to receive permission of state agency before soliciting proxies, "upsets the neutrality and equal standards of conduct required by the federal proxy laws" and was thus preempted), *aff'd on other grounds,* 687 F.2d 1122 (8th Cir. 1982). We conclude that § 48:2–51.1 is preempted by federal law;[15] we find that the

---

**12.** We therefore disagree with defendants' argument that the federal proxy regulations, while addressed to achieving "full disclosure of information" and "full democratic participation among shareholders," are in no way concerned with the establishment of an equality between management and outsiders—in terms of access and opportunity—in contested elections. We find this splintering of interests artificial.

**13.** Under N.J.Stat.Ann. § 14A:5–7, the record date shall be not more than sixty nor less than ten days before the date of the meeting.

**14.** Defendants suggest that a challenger could avoid this problem by applying to the BPU well in advance of an annual meeting. We agree with plaintiff, however, that the commercial realities of bids for control could in some situations make this practice awkward and unworkable.

**15.** State anti-takeover laws regulating tender offers have for the most part been held to be preempted by the Williams Act, 15 U.S.C. §§ 78m(d)-(e), 78n(d)-(f), on the ground that the state law destroys the balance between the in-

proper remedy for plaintiff is a new election, unburdened of the requirements of the New Jersey statute.[16]

### E. Defendant NJR's motion for judgment on the pleadings on Count Five

Plaintiff claims in Count Five of the amended complaint that if the statute is held to be lawful, it applies equally to NJR, because NJR was seeking to retain control over the corporation through the reelection of its slate of directors. Plaintiff argues, therefore, that NJR's failure to obtain BPU approval before soliciting proxies requires a new election. Although we are inclined to agree with Defendant NJR that plaintiff's argument reflects an implausible interpretation of the statute, our holding that the statute is preempted by federal law renders our resolution of this motion unnecessary.

---

cumbent management and the offeror established by the Williams Act. *See, e.g., Kennecott Corp. v. Smith,* 637 F.2d 181 (3d Cir.1980), *on remand,* 507 F.Supp. 1206 (D.N.J.1981); *National City Lines, Inc. v. LLC Corp.,* 687 F.2d 1122 (8th Cir.1982); *MITE Corp. v. Dixon,* 633 F.2d 486 (7th Cir.1980), *aff'd on other grounds sub nom. Edgar v. MITE Corp.,* 457 U.S. 624, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982); *Great Western United Corp. v. Kidwell,* 577 F.2d 1256 (5th Cir.1978), *rev'd on other grounds sub nom. Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979); *cf. Agency Rent-A-Car, Inc. v. Connolly,* 686 F.2d 1029 (1st Cir.1982) (delay resulting from sanctions for violation of state anti-takeover laws did not conflict with Williams Act, because delay could be avoided by compliance with the state statute). Because we find that an important purpose behind the federal proxy law is this same preservation of equal opportunity for management and challenger alike, we consider this line of cases significant, although obviously not controlling, in our decision today.

**16.** As a result of our holding regarding the Supremacy Clause, we need not address the merits of plaintiff's challenge to the statute under the Commerce Clause or first amendment.