NUI CORPORATION, a New
Jersey Corporation

v.

Irwin I. KIMMELMAN, Attorney General of the State of New Jersey, and New Jersey Resources Corporation, a New Jersey Corporation.

Appeal of NEW JERSEY
RESOURCES, Appellant.

Nos. 84–5703, 84–5812.

United States Court of Appeals,
Third Circuit.

Argued April 29, 1985.

Decided June 25, 1985.

Rehearing and Rehearing In Banc
Denied July 25, 1985.

As Amended Aug. 21, 1985.

**400**

Richard B. McGlynn, Eric R. Breslin, Stryker, Tams & Dill, Newark, N.J., Thomas J. Schwarz, Peggy L. Kerr, (Argued), Harold Levy, Janet L. Goetz, Eric Friedberg, Skadden, Arps, Slate, Meagher & Flom, New York City, for appellant New Jersey Resources Corp.

Laurence B. Orloff (Argued), Deanne Wilson Plank, Orloff, Lowenbach, Stifelman & Siegel, P.A., Roseland, N.J., for NUI Corp.

Before GIBBONS and HIGGINBOTHAM, Circuit Judges, and NEWCOMER, District Judge *.

## OPINION OF THE COURT

GIBBONS, Circuit Judge:

New Jersey Resources Corporation (Resources) appeals of right pursuant to 28 U.S.C. § 1292(a)(1) (1982) and by permission pursuant to 28 U.S.C. § 1292(b) (1982) from a summary judgment declaring N.J. Stat.Ann. § 48:2–51.1, 1984 N.J.Sess.Law. Serv. ch. 2 (West), unconstitutional, vacating the election of Resources' Board of Directors held on February 2, 1984, and directing that a new election shall be held. The appeals have been consolidated. The order appealed from was entered in a suit by N.U.I. Corporation (NUI) against Irwin I. Kimmelman, Attorney General of New Jersey, and against Resources.[1] The dispute that inspired the NUI complaint is a proxy contest in which NUI failed to oust Resources' Board of Directors and replace it with NUI candidates. We hold that the court erred in vacating the election held on February 2, 1984 and in unnecessarily deciding the issue as to whether N.J.Stat. Ann. § 48:2–51.1 was unconstitutional, and we reverse.[2]

### I.

Resources and NUI, both incorporated in New Jersey, are investor-owned public utility holding companies, exempt from the Public Utility Holding Company Act of 1935, 15 U.S.C. § 79 et seq. (1982), because their activities are essentially intrastate. The stock of both is traded on the New York Stock Exchange, and both have shareholders residing in various states and countries. Resources has a principal subsidi-

---

\* Hon. Clarence C. Newcomer, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

1. Although the district court held a New Jersey statute unconstitutional, the Attorney General has not appealed, and has not participated in the appeal as amicus curiae.

2. The district court opinion is reported. *NUI Corporation v. Kimmelman,* 593 F.Supp. 1457 (D.N.J.1984).

ary, New Jersey Natural Gas Company, and NUI has a principal subsidiary, Elizabethtown Natural Gas Company, each of which engages in the distribution of natural gas to residential, commercial, and industrial customers in separate franchise areas. in New Jersey. New Jersey Natural Gas Company and Elizabethtown Gas Company are public utilites, as defined in N.J.Stat.Ann. § 48:2–13,[3] and thus are subject to the regulatory jurisdiction of the New Jersey Board of Public Utilities (the Board).[4]

In November, 1983 NUI made two merger proposals to the management and directors of Resources. Because NUI owned less than five percent of Resources' outstanding shares, those proposals did not fall under the coverage of the Williams Act. *See* 15 U.S.C. § 78n(d)(1) (1982). Both proposals were rejected by Resources' management and directors. Thereupon, on December 1, 1983, NUI announced its intention to wage a proxy contest for the stated purpose of electing to Resources' Board of Directors a majority slate of seven directors who would support the merger.

The annual meeting of Resources' shareholders, scheduled for January 6, 1984, was rescheduled for February 2, 1984. Between December 1, 1983 and February 2, 1984, NUI and Resources waged an intense proxy contest. NUI's proxy solicitation materials claimed that the merger would benefit Resources' shareholders and would result in higher dividends. Resources countered that it was a stronger company than NUI, that Resources had always paid better dividends than NUI, and that the merger would impede Resources' future access to supplies of natural gas. NUI's solicitation materials also contained information about the merger terms it intended to offer to Resources' shareholders. Resources countered that NUI had not yet made an offer to purchase Resources' shares, and in fact was prohibited by New Jersey law from making such an offer until the Board of Public Utilities approved the merger.[5] Resources also called attention to the need for approval of the merger by the Department of Justice and the Federal Trade Commission before any offer was made to shareholders.

In addition to its own campaign resisting NUI's proxy solicitation, Resources petitioned the Board of Public Utilities on December 7, 1983 for an order halting NUI's proxy solicitation, and for other relief. On January 17, 1984 the Board held a hearing on the petition, and on January 31, 1984, it issued an order. By then Resources had withdrawn its request for an order halting NUI's proxy solicitation, and the Board did not pass on it. The Board's order did,

**3.** N.J.Stat.Ann. § 48:2–13 states in relevant part that "[t]he term 'public utility' shall include every ... corporation ... that now or hereafter may own, operate, manage or control within this State any ... pipeline, gas ... system, plant or equipment for public use, under privileges granted ... by this State...."

**4.** N.J.Stat.Ann. § 48:2–13 states in relevant part that "[t]he board shall have general supervision and regulation of and jurisdiction and control over all public utilities ... and their property, property rights, equipment, facilities and franchises...."

**5.** N.J.Stat.Ann. § 48:3–7 states in relevant part that "[n]o public utility shall, without approval of the board, ... merge or consolidate its property, franchises, privileges or rights, or any part thereof, with that of any other public utility. Every ... merger or consolidation made in violation of this section shall be void." N.J.Stat. Ann. § 48:3–10 states in relevant part:

No public utility incorporated under the laws of this state shall sell, nor ... make or permit to be made upon its books any transfer of any share or shares of its capital stock, to any other public utility, unless authorized to do so by the board. Nor shall any public utility incorporated under the laws of this state sell any share or shares of its capital stock or make or permit any transfer thereof to be made upon its books, to any corporation, ... the result of which sale or transfer in *itself or in connection with other previous* sales or transfers shall be to vest in such corporation ... a majority in interest of the outstanding capital stock of such public utility corporation *unless authorized to do so by the* board.

Every assignment, transfer, contract or agreement for assignment or transfer, by ... any ... *corporation to any corporation ... in* violation of any of the provisions hereof shall be void and of no effect, and no such transfer shall be made on the books of any public utility corporation.

however, assert jurisdiction to approve or disapprove the merger, and outlined twelve public interest factors which it would consider. The Board directed that, pending review of any merger proposal, the current senior management of New Jersey Natural Gas must be retained and permitted to manage and operate that utility. It also enjoined Resources' Board of Directors from seeking or obtaining ratification by Resources' shareholders of any merger proposal before the Board of Public Utilities evaluated and reached a determination on the planned merger. Thus, the effect of the Board's order was to permit proxy solicitation to go forward, but to prevent any other steps toward consummation of a merger until after Board approval.

While Resources' petition was under consideration by the Board of Public Utilities, the proxy contest for control of Resources' Board of Directors received the attention of the New Jersey Legislature. Early in January 1984, the Assembly considered Bill A-826, which would supplement Title 48 of the New Jersey Revised Statutes by broadening the authority of the Board of Public Utilities. Resources' management lobbied for its passage, and on January 30, 1984 it was passed by both houses of the legislature. The legislation was signed into law by the Governor on Tuesday, January 31, 1984: the same date on which the Board of Public Utilities entered the order referred to in the preceding paragraph. The new legislation provides in relevant part:

> No person shall acquire or seek to acquire control of a public utility directly or indirectly through the medium of an affiliated or parent corporation or organization, or through the purchase of shares, the election of a board of directors, the acquisition of proxies to vote for the election of directors, or through any other manner, without requesting and receiving the written approval of the Board of Public Utilities. Any agreement reached, or any other action taken, in violation of this act shall be void. In considering a request for approval of an acquisition of control, the board shall evaluate the impact of the acquisition on competition, on the rates of ratepayers affected by the acquisition of control, on the employees of the affected public utility or utilities, and on the provision of safe and adequate utility service at just and reasonable rates. The board shall accompany its decision on a request for approval of an acquisition of control with a written report detailing the basis for its decision, including findings of fact and conclusions of law.

N.J.Stat.Ann. § 48:2-51.1. The Resources annual meeting was scheduled for Thursday, February 2, 1984; no effort to enforce the new legislation with respect to NUI's proxy solicitation was made by Resources, the Board of Public Utilities, or the Attorney General.

## II.

On February 1, 1984 NUI filed the verified complaint which commenced these proceedings. The complaint alleges that N.J. Stat.Ann. § 48:2-51.1 is unconstitutional for several reasons. NUI sought a temporary restraining order which would prevent the scheduled election on the next day, claiming that the statute prohibited use of its proxies already in hand, prohibited further solicitation, and would in any event materially affect the outcome of the election by creating the impression that its proxies were invalid. Resources and the Attorney General had notice of this application and appeared in opposition. When Resources represented that it did not intend to take any steps before the Board of Public Utilities or before any other forum to seek enforcement of N.J.Stat.Ann. § 48:2-51.1 against NUI, the district court refused to issue a temporary restraining order, and the February 2, 1984 meeting went forward.

At the annual meeting, each of the nominees on the Resources' slate of directors received a minimum of 1,905,168 votes, while the highest vote for any nominee on the NUI slate was 1,141,646 votes. Thus the Resources slate won by at least 763,522 votes. Only 354,539 proxies were executed

on or after January 30, 1984, the day the legislature enacted A–826.

### III.

After the election, NUI filed an Amended and Supplemental Complaint, pleading five counts. Although other relief is sought, common to each count is a prayer that the February 2, 1984 election be set aside. The first two counts allege violations by Resources of section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1982), and of the Securities and Exchange Commission Rule 14a–9(a), 17 C.F.R. § 240.14a–9(a) (1984). Counts three and four allege that N.J.Stat.Ann. § 48:2–51.1 is unconstitutional because it impermissibly constrains proxy solicitation in violation of federal statutes and regulations which, under the supremacy clause, preempt state law, and because it violates the commerce clause and the first amendment. Count five alleges that if N.J.Stat.Ann. § 48:2–51.1 is constitutional, Resources failed to comply with it, and the election should be set aside for this reason. Counts one, two and five remain to be adjudicated. The orders appealed from grant NUI's motion for summary judgment that N.J.Stat.Ann. § 48:2–51.1 is unconstitutional, enjoin enforcement of that statute, set aside the results of the February 2, 1984 election, and order a new election. On application of Resources the trial court stayed, pending appeal, the provisions of the judgment setting aside the election and ordering a new election.

While granting NUI's motion for summary judgment on counts three and four, the district court rejected the cross-motion for summary judgment by Resources and the Attorney General on those counts. That motion advanced the contention that because N.J.Stat.Ann. § 48:2–51.1 could not as a matter of fact have affected the outcome of the election, neither declaratory nor injunctive relief was appropriate. Purporting to apply the test announced in

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 384, 90 S.Ct. 616, 621, 24 L.Ed.2d 593 (1970) that misstatements with respect to proxy materials are material so long as they have "a significant *propensity* to affect the voting process," the district court ruled that the statute's propensity to affect the outcome of the election was sufficient to entitle NUI to relief if the statute was unconstitutional. Having so concluded, the court then proceeded to the supremacy clause issue. The court held that N.J.Stat. Ann. § 48:2–51.1

> disrupt[ed] the evenhanded approach to proxy solicitation set out in the federal rules—designed to protect the investor by, in part, striking a balance between existing management and those who would seek to control—impedes the execution of Congress' and the SEC's objectives underlying § 14(a) and Rule 14a–9(a).

593 F.Supp. at 1470. The proper remedy, the court concluded, was a new election unburdened of the requirements of the challenged statute.

The district court did not address NUI's commerce clause and first amendment contentions.

### IV.

■ Our starting point is the salutary rule that courts should avoid whenever possible a premature adjudication that duly enacted legislation is unconstitutional. That rule is no less applicable when the challenge to a state statute is made on statutory supremacy grounds, for while a statutory supremacy holding is subject to congressional override, the realities of the federal legislative process are such that relief for a state or a party in that form is not likely. The undesirability of foreclosing the future to a legislature, state or federal, has prompted the Supreme Court to develop doctrines of standing to challenge the constitutionality of statutes.[6]

---

6. *E.g., Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Poe v. Ullman,* 367 U.S. 497, 81 S.Ct. 1752, 6 L.Ed.2d

The terminology of standing cases is, perhaps, unfortunately obscure

The terminology of standing cases is, perhaps, unfortunately obscure, since some of it suggests that a court may decline to hear a challenge to a statute even by a party adversely affected by it. The core idea found in the standing cases, however, is that a party seeking relief for past or reasonably likely prospective injury must demonstrate some causal connection between the past or prospective injury and the challenged statute.[7] Couching the prayer for relief as a request for a declaratory judgment as well as for injunctive relief does not change the analysis.[8] Thus the district court should not have granted a summary judgment holding that N.J.Stat.Ann. § 48:2–51.1 is preempted by the Securities Exchange Act unless NUI demonstrated some causal connection between the injury for which it sought relief—the loss of the election—and that statute.

In support of the cross-motion for summary judgment, Resources filed the affidavit of Vincent J. Love, a partner in Arthur Young & Company, certified public accountants, who served as an inspector of election at the February 2, 1984 Resources annual meeting. The affidavit establishes, without contradiction, that 3,394,415 shares of Common Stock of Resources were outstanding on the record date for that meeting, and that 90.69% of those shares were voted. The lowest vote for a member of the Resources slate was 1,905,168 shares, while the highest vote for election of a NUI nominee was 763,522 shares. Only 354,539 shares voted at the election were represented by proxies executed on or after January 30, 1984, and many of these were duplicates of proxies executed prior to that date. Thus if all 354,539 shares represented by proxies executed after January 30, 1984 had been voted in favor of the NUI nominees, the outcome of the election would have been the same.

Neither in the original verified complaint, nor in any affidavit filed in opposition to the cross-motion for summary judgment, did NUI make any factual showing that absent the enactment of the statute it would, could, or might have been able to obtain proxies for the additional shares it needed to elect a director. In its original complaint, verified on information and belief on January 31, 1984, NUI alleged:

At approximately 5:30 p.m. on January 31, 1984, NUI learned that the Governor of the State of New Jersey had signed into law Assembly Bill A–826, entitled "An Act concerning the acquisition of control of public utilities, and supplementing Title 48 of the Revised Statutes." ... NUI thereupon ceased all soliciting activities.

We attach no significance to this representation, since it was obviously made during the evening of January 31, after the close of business. There is no suggestion in the record that solicitation would have taken place, or would have been significantly effective, during the night. In the Amended and Supplemental Complaint, which is not verified even on information and belief, NUI repeats the allegation that it learned of the statute at 5:30 p.m. on January 31, 1984. It then alleges:

NUI thereupon ceased all soliciting activities, and attempted to resume same only on the afternoon of February 1, 1984, the day before the election, based upon statements made on behalf of the Attorney General of New Jersey with respect to the subject Statute in a proceeding before this Court on plaintiff's application for a temporary restraining order enjoining the election scheduled for February 2, 1984.

Patently this unverified allegation does not satisfy the requirements of Fed.R.Civ.P. 56(e). *Ness v. Marshall*, 660 F.2d 517, 519

---

989 (1961); *Massachusetts v. Mellon*, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

**7.** See *Doherty v. Rutgers School of Law—Newark*, 651 F.2d 893 (3d Cir.1981); *Howard v. New Jersey Department of Civil Service*, 667 F.2d 1099 (3d Cir.1981).

**8.** *United Public Workers of America v. Mitchell*, 330 U.S. 75, 89–90, 67 S.Ct. 556, 564, 91 L.Ed. 754 (1947); *Aetna Life Insurance Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937).

(3d Cir.1981). Moreover even if the complaint were verified, it would establish at most that NUI refrained from solicitation for substantially less than 24 hours, a good part of the time during the hours of darkness, and only a few hours during business hours. There is no affidavit on file suggesting that solicitation during the interim, on the very eve of the election, would have produced any significant results. Indeed NUI did not even attempt to analyze for the court how those shareholders voted whose proxies were dated on or after July 31, 1984. No affidavits, depositions, interrogatories, or admissions furnish any additional information about the effects of NUI's short voluntary cessation of solicitation, assuming it took place.

■ It is undisputed that no effort was made to enforce N.J.Stat.Ann. § 48:2–51.1 against NUI, and the uncontradicted Love affidavit establishes that proxies solicited after the date of the enactment of that statute could not have affected the outcome. This is a case, therefore, in which the record establishes that whether the statute is constitutional or unconstitutional, its enactment had no "significant *propensity* to affect the voting process." *Mills v. Electric Auto-Lite Co.*, 396 U.S. at 384, 90 S.Ct. at 621. There is, on this record, a complete absence of any proximate causal relationship between the enactment of the statute and the outcome of the election which NUI seeks to have set aside. Thus the district court erred as a matter of law in addressing the statutory supremacy challenge to N.J.Stat.Ann. § 48:2–51.1, and in setting the election aside on the basis of that challenge.

### V.

The summary judgment holding N.J.Stat. Ann. § 48:2–51.1 to be preempted by the Securities Exchange Act, vacating the February 2, 1984 Resources election of directors, and ordering a new election will be reversed.[9] The district court made an ex-

press determination pursuant to Fed.R. Civ.P. 54(b) that there was no just reason for delaying entry of final judgment on Count three of the Complaint. Our determination that there was no proximate causal relationship between the New Jersey statute and the election will perforce require the district court to enter summary judgment for defendants on Count four. We will direct summary judgment for Resources on Count three, and remand to the district court for proceedings consistent with this opinion on the remaining claims.

---

9. Because of the failure of NUI to establish any proximate cause of the relationship between the enactment of the statute and the outcome of the election, we make no judgment as to whether the New Jersey statute is preempted by the Securities Exchange Act.